[S.F. No. 23656. May 24, 1978.]

JOHN KIRSCH et al., Plaintiffs and Respondents, v.
JAMES J. DURYEA, Defendant and Appellant.

304

**COUNSEL**

Robert T. Cresswell and Michael James Moriarty for Defendant and Appellant.

John Mullen and Carol Miller for Plaintiffs and Respondents.

**OPINION**

**CLARK, J.**—Defendant, an attorney, appeals from a legal malpractice judgment following jury verdict. We conclude the evidence is insufficient to support the judgment.

Evidence at trial revealed that in February 1963 plaintiff fell injuring his left shoulder while employed. A preoperative diagnosis revealed "probable tear, musculotendinitus cuff, left shoulder." The tear was repaired surgically and the arm placed in an airplane splint. An airplane splint is designed to hold the patient's arm in the air perpendicular to the axis of the body with the forearm bent forward at the elbow in a 45 degree angle. The splint must be carefully applied and padded to prevent pressure on the elbow area against the ulnar nerve, commonly called the crazy bone.

The splint was removed five days after plaintiff's release from the hospital.

On 29 February 1964, plaintiff was examined by Dr. Hickey who found plaintiff had pain and numbness in parts of his left shoulder, forearm and some numbness in the shoulder area near the surgical scar. The anterior portion of the deltoid muscle was atrophic and the lateral extension of the left arm was about 60 percent less than normal. Dr. Hickey diagnosed the problem as ulnar nerve damage, believing it was due to an improper airplane splint. He operated on plaintiff to relieve pressure on the ulnar nerve and to prevent paralysis of the hand. Before the operation plaintiff had no feeling in his lower arm, elbow and fingers, but following the operation some feeling was restored.

Numbness continued in the forearm and in areas that Dr. Hickey believed were not caused by ulnar nerve damage.

In November 1964 Dr. Hickey sent plaintiff to a neurologist who, on the basis of his examination and tests performed, concluded that the surface of the ulnar nerve was intact and that the plaintiff's injury was due to neurosis of the brachial plexus. In December 1964 Dr. Hickey wrote a report to the workers' compensation carrier stating he agreed with the neurologist's report. However, he raised a third possible cause, pointing out that X-ray reports showed cervical spine changes and stating: "This sort of picture makes one think of degenerative disc disease with nerve root and spinal cord compression and this may be his reason for the pain and his disability now rather than a true ulnar nerve peripheral lesion." Dr. Hickey recommended a cervical myelogram. The myelogram indicated plaintiff's injury was not due to spine changes.

A few days before the statute of limitation would bar any medical malpractice action, plaintiff was referred by his workers' compensation attorney to defendant who was experienced in medical malpractice litigation. The latter filed a complaint on 23 March 1965. Shortly after suit was filed, plaintiff moved to New Mexico, and subsequent communication between them was by telephone or mail.

Defendant reviewed the workers' compensation file including its medical records, conversed with physicians, and did medical and legal research, but did not depose any of the doctors. At some point prior to 21 July 1969, he concluded trial was not justified because of insufficient evidence of malpractice.

Of the several doctors whose reports were examined, only Dr. Hickey indicated that the injury might be due to cause involving medical malpractice—ulnar nerve damage from an improper airplane splint—and his December 1964 report, as indicated above, stated that continuing disability was due to other causes, including the possibility of a spinal disorder, warranting a myelogram. Plaintiff failed to inform defendant that a myelogram had been performed and defendant was unaware of it.

On 21 July 1969 defendant informed plaintiff by mail of his conclusion the case could not be established and that he would proceed no further. He enclosed a substitution of attorneys form, substituting plaintiff in propria persona and asked that the form be signed and returned within 15 days. Defendant pointed out that until another attorney was retained plaintiff must act as his own attorney. Offering full cooperation with any attorney plaintiff designated, defendant repeatedly stressed the need to bring the case to trial within five years, specifying in capital letters, "THIS CASE MUST BE BROUGHT TO TRIAL AND TRIAL MUST BE COMMENCED BEFORE MARCH 23, 1970."

Not hearing from plaintiff, defendant sent a second letter on 5 September 1969, stating that if the substitution form was not signed and returned within 10 days, defendant would move for withdrawal from the case. No date for the motion was given in the letter. Defendant then filed his motion to withdraw on 25 November and hearing was set for 9 January. Plaintiff was not served with notice of motion. The matter was continued by the court to 27 January 1970 and notice was mailed by defendant to plaintiff. The motion was granted without opposition or appearance by plaintiff. Plaintiff testified he did not receive notice and was unaware of the motion and hearing.

After receipt of the July letter, plaintiff consulted various attorneys. One of them, a San Francisco attorney, examined the file and agreed with defendant's assessment of the case, sending defendant a copy of his letter declining employment. A New Mexico attorney referred plaintiff to a Texas attorney who, according to plaintiff, made arrangements with two California attorneys to represent him. However, plaintiff never replied to the two letters from defendant, and defendant did not hear from the two California attorneys until April 1970, after the March trial deadline.

The medical malpractice case was dismissed on 12 May 1970 for failure to comply with the five-year trial requirement of Code of Civil Procedure section 583.

At the instant legal malpractice trial, John Lewis, a Sacramento attorney, testified a lawyer owes a continuous duty to represent a client and to do nothing which would prejudice the case irrespective of its lack of merit. He recognized lawyers frequently withdraw from cases and sometimes another will proceed to obtain a significant recovery. However, he concluded that it is improper for an attorney to withdraw when only two months remain to bring the matter to trial. He further testified it would have been proper for defendant, after concluding the case lacked merit, to withdraw the prior summer, allowing the client nine months to find another attorney.

The jury found defendant attorney negligent, assessed damages of $237,100, found plaintiff 2.5 percent negligent, and reduced the award to $231,175.50.

## GENERAL RULE

"The general rule with respect to the liability of an attorney for failure to properly perform his duties to his client is that the attorney, by accepting employment to give legal advice or to render other legal services, impliedly agrees to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake. (*Estate of Kruger,* 130 Cal. 621, 626 [63 P. 31]; *Moser* v. *Western Harness Racing Assn.,* 89 Cal.App.2d 1, 7 [200 P.2d 7]; *Armstrong* v. *Adams,* 102 Cal.App. 677, 684 [283 P. 871]; see Wade, *The Attorney's Liability for Negligence* (1959) 12 Vanderbilt L.Rev. 755, 762-765; 5 Am.Jur. 336.) The attorney is not liable for every mistake he may make in his practice; he is not, in the absence of an express agreement, an insurer of the soundness of his opinions or of the validity of an instrument that he is engaged to draft; and he is not liable for being in error as to a question of law on which reasonable doubt may be entertained by well-informed lawyers. (See *Lally* v. *Kuster,* 177 Cal. 783, 786 [171 P. 961]; *National Savings Bank* v. *Ward,* 100 U.S. 195, 198 [25 L.Ed. 621]; 5 Am.Jur. 335; 7 C.J.S. 980.) These principles are equally applicable whether the plaintiff's claim is based on tort or breach of contract." (*Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685]; *Smith* v. *Lewis* (1975) 13 Cal.3d 349, 358 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231]; 1 Witkin, Cal. Procedure (2d ed. 1970) pp. 161-162.)

CONFLICTING OBLIGATIONS

Frequently an attorney is confronted with legitimate but competing considerations, and we have recently recognized a latitude granted the attorney engaged in litigation in choosing between alternative tactical strategies. (*Smith* v. *Lewis, supra,* 13 Cal.3d 349, 359; see *Banerian* v. *O'Malley* (1974) 42 Cal.App.3d 604, 613 [116 Cal.Rptr. 919].)

In addition to competing strategies, an attorney is often confronted with clashing obligations imposed by our system of justice. An attorney has an obligation not only to protect his client's interests but also to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice.

In absence of a specific rule of conduct governing the situation before him, determination of the attorney's duty of care when conflicting interests arise is made by balancing those interests, keeping in mind that it would be unfair to require the attorney to pay damages merely upon a showing of a mistake in choice. To hold the attorney responsible in damages whenever in retrospect it appears he mistakenly sacrificed his client's interests in favor of his public obligations would place an impossible burden on the practice of law. Moreover, awarding damages against the attorney would violate sound public policy, because an attorney frequently faced with the question whether vigorous advocacy in favor of a client must be curtailed in light of public obligation would tilt in favor of the client at the expense of our system of justice.

When apparent conflict exists between the attorney's duty to his client on the one hand and his public obligation on the other, it is not sufficient to show that some or many prudent attorneys would not have made the mistake. The attorney's choice to honor the public obligation must be shown to have been so manifestly erroneous that no prudent attorney would have done so.

Here, defendant was confronted with a choice between his duty to advance his client's cause by continuing to prosecute the action and his duty to fair administration of justice to refuse to maintain actions believed to lack merit.

An attorney's duty is to maintain only such actions as appear to him legal or just. (Bus. & Prof. Code, § 6068, subd. (c).) "When an attorney

loses faith in his cause he should either retire from the case or dismiss the action." (*Larimer* v. *Smith* (1933) 130 Cal.App. 98, 101 [19 P.2d 825].)

Rules of Professional Conduct rule 2-110(2) provides that a member of the State Bar shall not accept employment to present "a claim or defense in litigation that is not warranted under existing law, unless it can be supported by good faith argument for an extension, modification, or reversal of existing law." Rule 2-111(C) provides for permissive with-drawal when the client insists upon presenting a claim that is not warranted under existing law and cannot be supported by good faith argument for extension, modification, or reversal of the law.

The judgment before us may not be upheld on the basis of asserted erroneous evaluation of the merits of the cause of action. Viewing the evidence in the light most favorable to plaintiff, the evidence available to defendant at the time he determined the action lacked legal merit reflected that several doctors believed plaintiff's ailment resulted from something other than negligence. There was no direct evidence that the airplane splint was faulty. The one doctor who first believed that the injury was due to a defective splint, in a subsequent letter of December 1964, questioned his own initial opinion. Furthermore, that doctor's attempt to treat by surgery had in large part, if not entirely, failed. Based on the materials available to defendant, the possibility of recovery was remote; certainly the determination that the action was not meritorious cannot be characterized as manifestly erroneous.

### WITHDRAWAL

Plaintiff further contends the judgment may be upheld upon the theory that defendant improperly delayed in securing court discharge.

Rules of Professional Conduct, rule 2-111(A)(2) states: "[A] member of the State Bar shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, including giving due notice to his client, allowing time for employment of other counsel, delivering to client all papers and property to which the client is entitled, and complying with applicable laws and rules." While this rule was not in effect at the time of the actions at issue, the rule states a long-accepted standard of professional conduct. (See ABA Code of Prof. Responsibility, DR 2-110(A)(2).)

■ A valid purpose is served by the requirement that the withdrawing attorney delay seeking court approval to permit his client to secure other representation. When the attorney seeks to withdraw without consent of client, there is an obvious inference his withdrawal is not for the client's purpose but for the attorney's purpose, usually a lack of confidence in the merits of the case. The inference is obvious to the parties in the case and will ordinarily gravely jeopardize any chance of settlement. On the other hand, consensual withdrawal or substitution of another attorney—as opposing counsel are well-aware—may be due to numerous reasons—even personal—casting no reflection on the client's case. Accordingly, an attorney should not seek a nonconsensual withdrawal immediately upon determination that the case lacks merit, but should delay to give his client an opportunity to obtain other counsel or to file a consensual withdrawal.

Plaintiff's expert testified that the attorney who concludes his client's case lacks merit should quickly proceed to obtain a nonconsensual discharge. This is contrary both to our rules of professional conduct and the American Bar Association's disciplinary rule.

Defendant gave due notice by letter in July and in September of his intended withdrawal. He offered all materials pertaining to the case, and advised plaintiff of the need for quick action. He sent the file to one of the attorneys consulted by defendant.

Defendant did all he could to avoid the inference of lack of merit by delaying his nonconsensual withdrawal. His delay in seeking the formal order does not reflect absence of due care but rather compliance with the rules.

### INVESTIGATION

The third basis urged in support of the finding of attorney negligence is that defendant should have investigated further. But no expert testimony was elicited warranting a determination of negligent investigation. ■ Although in some cases expert testimony is not required to establish standard of care (see *Wright* v. *Williams* (1975) 47 Cal.App.3d 802, 810 [121 Cal.Rptr. 194]), this is not one of them. The extent to which an attorney, in the exercise of due care, will advance funds to hire investigators, depose witnesses, or perform tests on a client is not a matter of common knowledge.[1]

---

[1]In view of the conclusion reached, it is unnecessary to consider defendant's other claims of error. It is urged that plaintiff's intentional refusal to respond to the withdrawal

The judgment is reversed.

Tobriner, Acting C. J., Mosk, J., Manuel, J., Newman, J., Caldecott, J.,* and Racanelli, J.,* concurred.

Respondents' petition for a rehearing was denied June 22, 1978. Bird, C. J., and Richardson, J., did not participate therein. Newman, J., was of the opinion that the petition should be granted.

---

letter constituted a breach of the covenant of good faith and fair dealing implied in every contract (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9 [123 Cal.Rptr. 288, 538 P.2d 744]) and that such breach is not merely contributory negligence but a full defense. It is also urged that there was error in submitting the case to the jury on a res ipsa loquitur theory and that the evidence is insufficient to sustain the finding of medical malpractice.

*Assigned by the Acting Chairperson of the Judicial Council.