[No. B012138. Second Dist., Div. Three. Jan. 20, 1987.]

Estate of JOHN A. FALCO, Deceased.
G. DANA HOBART et al., Petitioners and Appellants, v.
MAHRIA DECKER et al., Objectors and Respondents.

1006

**COUNSEL**

G. Dana Hobart and Richard H. Oshman, in pro. per., Gerald H. B. Kane, Jr., and Oshman, Brownfield & Smith for Petitioners and Appellants.

Patten, Faith & Sandford, Jules Sandford and Lorraine Grindstaff for Objectors and Respondents.

**OPINION**

**LUI, J.**—In this appeal, we address the question of an attorney's right to a quantum meruit recovery of fees after the attorney has voluntarily withdrawn from a case and the case is subsequently settled. In deciding this appeal, we do not intend our opinion to apply to a related but different question regarding the circumstances in which an attorney has a right to withdraw from a case.

FACTUAL AND PROCEDURAL BACKGROUND

Four sisters, Mahria Decker, Silvia McAbee, Lyn Reimholz and Lee Falcon (respondents)[1] entered into a contingency fee agreement with appellants G. Dana Hobart (Hobart) and the law firm of Oshman, Brownfield & Smith (Oshman) (collectively appellants) in September 1979 for the purpose of contesting the will of their deceased brother, John Falco (decedent). Appellants filed a petition for revocation of probate of purported will in December 1979, on behalf of the respondents. The decedent's fifth sister, Virginia Vosburg, appeared in propria persona.

Inter alia, the decedent's will bequeathed $2,000 to each of his five sisters, leaving the bulk of decedent's estate to his friend and secretary Phyllis Werden. The value of the estate at the time of death in August 1979 was $918,924. The will was witnessed by the mother of Phyllis Werden, and executed by the decedent in October 1971, while he was hospitalized for liver complications stemming from alcoholism.

The contingency agreement provided that appellants would be obligated to "handle the Will contest up to and through the trial thereof and a Motion for a new trial, if any." Noting that neither the clients nor appellants knew the value of the estate, the contract specified that appellants "may withdraw as attorneys for the Contestants, if they discover that there are not sufficient assets subject to the contingency fee arrangement portion of the Estate to warrant them to prosecute said action."

In April 1983, all parties appeared in court prepared to begin trial, but stipulated to postpone trial until September due to an overcrowded court calendar. Thereafter, on May 11, Hobart then conducted an investigation and met with Dr. Telfer Reynolds, one of many physicians who examined the decedent in the hospital in October 1971, during the time decedent executed his will. Dr. Reynolds expressed his opinion that the decedent was competent at that time and able to execute a will, and was not in a mental or physical condition rendering him susceptible to influence.

Dr. Reynolds's evaluation prompted Hobart to advise respondents by letter dated May 13, 1983: "... In short, [Dr. Reynolds's] testimony is directly contrary to our best interests in *every* respect.

"... [T]here is at least one mutual friend that John Falco and Ginny Vosburg had, the name of whom escapes me at the moment without digging

---

[1]For ease of reference, we collectively refer to all four clients as respondents, although only two of the sisters have appeared on this appeal.

into the file, who has unequivocally stated that during the last five or more years of your brother's life was [*sic*] angered with his sisters and intended to disinherit them.

"The foregoing are facts of life. Whether or not you like the facts of life is of no importance. My role and responsibility is to attempt to evaluate the win/lose potential of any litigation. Only a fool would not see the handwriting on the wall and reject settlement negotiations when confronted with this kind of evidence and testimony. For these reasons I am asking that each of you communicate to me your immediate willingness to accept any settlement that I can put together. If you do not do so, I will be forced to withdraw from a [*sic*] case on the basis that it is unethical for me and Mr. Oshman to proceed with litigation that we consider to be without merit. . . .

". . . . . . . . . . . . . . . . . . . .

"Finally, please understand that my position is unequivocal and cannot be changed by discussing irrelevant issues with you and listening to each of you tell me how much John Falco cared for and loved each of you.

"Your failure to respond within 10 days, in writing, will leave me with no choice but to file a motion in court setting forth the reasons why Mr. Oshman and I are seeking permission to be relieved as counsel. Please understand that under these circumstances the court will have no alternative but to grant our motion and you will be faced with representing yourself or securing new trial counsel at this late date." (Italics in original.)

Hobart deposed Dr. Reynolds in two sessions, on May 18 and June 1, 1983, and concluded that Dr. Reynolds's testimony and reputation were unshakeable.

Appellants contend that prior to June 9, 1983, Hobart discussed settlement with his clients, who predicated their authority to settle upon appellants reducing their attorneys' fees, and upon the fifth sister, Vosburg, sharing in the payment of attorneys' fees. Respondents deny authorizing settlement and contend that they requested a reduction of attorneys' fees because the amount specified in the contract was unconscionable. The contract provided for appellants to receive 33⅓ percent of the decedent's gross estate if the case was settled before trial. Respondents allege that they requested appellants to amend the contract to provide for the attorneys' fees to be based on a percentage of respondents' recovery rather than a percentage of the value of the gross estate.[2]

---

[2]Based on the valuation of the decedent's estate of $918,924 stated in the inventory and appraisement, upon any settlement before trial under the terms of the contingent fee agree-

The facts in the record shed no light on the incidents which led Hobart to write to his clients on June 9, 1983, that "[b]ased on the authority previously given us, Mr. Oshman has made a settlement offer to the attorney for Phyllis Werden that we settle the claim on a 50/50 basis."[3] Hobart's letter further stated that he and Oshman agreed to "the modifications which [respondents] requested,"[4] and that appellants would not need to file a motion to withdraw if the settlement negotiations were successful. Hobart informed respondents that he would be leaving the United States for a period of one year on July 28, 1983. He then warned respondents that "if something should occur which would nullify our settlement discussions or otherwise terminate them, you are placed on notice that I will not be available for trial under any circumstances."

By certified mail on June 14, 1983, Mahria Decker immediately denied that she ever gave appellants the authority to settle, and intended to take the case to trial.

By letter dated June 20, 1983, Hobart wrote to Mahria Decker informing her that her denial of settlement authority left him with no alternative but to withdraw as attorney of record, and reiterating that he would be leaving the United States in August for a year and would not be available for trial under any circumstances.[5]

---

ment, appellants' fees would have been one-third of the gross estate, or approximately $306,305. Had respondents settled for 50 percent ($459,462), respondents would have received $153,157 after paying appellants $306,305. In comparison, if appellants' fees were calculated on the basis of the clients' recovery, in a settlement before trial of 50 percent, the clients would receive $306,310 and the appellants' fee of one-third would total $153,152.

[3]The record on appeal contains no documentation of a settlement authorization given by any of the four sisters.

[4]Appellants contend that respondents agreed to proceed with settlement on the condition that Virginia Vosburg agree to share in fees and costs. Since Ms. Vosburg refused, appellants decided to reduce their fees by 20 percent to give their clients the equivalent of their request. The record does not indicate whether respondents agreed to the 20 percent reduction as an equivalent of Vosburg's contribution.

[5]"Dear Mrs. Decker:

"I am afraid you have finally placed me at the end of a rope. Needless to say, I am referring to your letter of June 14, 1983.

" . . . . . . . . . . . . . . .

"To set the record straight I refer to your express authority to me to settle this matter on a '50/50' basis *if* your sister agreed to pay a one-fifth share of fees and expenses. . . .

"I am fed up with your saying one thing and doing another. . . . *I am through with you.*

" . . . . . . . . . . . . . . .

"I will file our motion to be relieved on June 27, 1983, unless you have someone substituted in as your attorney before that date.

" . . . . . . . . . . . . . . .

". . . You have made no secret of your dislike for me and I can't help but speculate that your change of position was intended to interfere with my planned sabbatical. Irrespective of your motives, I repeat that I will be leaving the country around August 1st and under no circumstances will I be available for trial in September." (Italics in original.)

On June 29, 1983, two months prior to the scheduled trial date, appellants filed their motion to withdraw as attorneys of record, on the basis that they believed that respondents' "case was, at best, on the *very* short end of being marginally meritorious." (Italics in original.) They argued that this belief became "cemented" by Dr. Reynolds's deposition testimony. Hobart contended that "[d]espite [respondents'] constant refusal to cooperate, Mr. Oshman and I have diligently prosecuted this cause. Not until we became convinced that we had no reasonable chance to prevail did we seek to be relieved as [respondents'] counsel."

Appellants contended that it was their legal duty to withdraw from prosecuting an action which they believed lacked merit, alleging "[n]ot only would it [have been] detrimental to [respondents] to be represented by counsel without faith in their cause, it would [have been] unethical for said attorneys to [have taken the] matter to trial."

Respondents, without benefit of legal counsel, did not file an opposition to appellants' motion to withdraw, but sent letters in opposition to the motion to the trial judge without serving copies on appellants. Respondents' sister, Virginia Vosburg, who never retained appellants as counsel, filed a formal opposition and appeared at the hearing.

Appellants' motion to withdraw was granted on the basis that the attorney-client relationship had completely broken down.[6] Trial was continued until January 1984. All parties to the will contest action were served with copies of appellants' motion to withdraw, and as a result were aware of appellants' evaluation of the merits of the case.

The mandatory settlement conference was held in December 1983, with respondents appearing in propria persona. Under the supervision of the trial court, the parties entered in a settlement agreement which specified, inter alia, that the decedent's five sisters would each receive one-fifth of a 36 percent share of the net balance of the estate.

In September 1984, appellants filed a petition seeking reimbursement of their costs and $48,000 in attorneys' fees. Appellants argued that their withdrawal was justified, entitling them to recover fees in quantum meruit because (1) their withdrawal was mandated by rules of professional conduct as a result of appellants' evaluation that the case was meritless; and (2) their clients did not cooperate and failed to authorize them to enter into settle-

---

[6]At the hearing of the motion, the trial court stated, "[I]t appears to the court . . . the attorney-client relationship is completely broken down. And I see no advantage to foisting either counsel on the clients and clients on the counsel and continuing what appears to be a totally irresolvable matter. [¶] Accordingly, the motion will be granted. . . ."

ment negotiations. In summarizing the important role appellants' work played in the eventual settlement of the case, appellants contended that there was a 2 percent chance their clients would prevail at trial as a result of their vigorous discovery work.[7] The trial court allowed appellants to recover their costs pursuant to the provisions of the contingent fee agreement, but denied recovery of attorneys' fees. This appeal followed.

CONTENTIONS ON APPEAL

Appellants contend that they are entitled to recover fees in quantum meruit because:

1. Appellants withdrew in adherence to ethical mandates stemming from their belief that respondents' case was meritless;

2. Respondents repudiated settlement authority and refused to settle;

3. Subsequent to appellants' withdrawal, respondents settled under terms similar to those negotiated by appellants; and

4. Respondents refused to cooperate.

DISCUSSION

I

*California Decisions Concerning an Attorney's Right to Fees Following Discharge or Withdrawal From a Contingent Fee Arrangement*

In *Fracasse v. Brent* (1972) 6 Cal.3d 784 [100 Cal.Rptr. 385, 494 P.2d 9], our Supreme Court articulated the respective rights of an attorney and client engaged in a contingent fee agreement when the attorney is discharged. A client's right and power to discharge his or her attorney at any time, with or without cause, is absolute. (*Id.,* at p. 790, citing Code Civ. Proc., § 284.)

---

[7]On the hearing of appellants' petition for attorneys' fees, Hobart commented on the settlement of the case by the Bank of America, trustee for decedent's trust set up for the benefit of Werden: ". . . the Bank of America and the executor [were] in a position where at least they had to be concerned about what the outcome of the case would be, not what they saw or didn't feel confident they'd win the case, because I'm sure they knew what I knew, that they would probably win the case 98 times out of 100. [¶] But there was still a 2 percent chance. Now, whatever motivated them to settle this case—not the sisters—whatever motivated the Bank of America to settle this case is what you should be considering. And what motivated them was my deposition taken of the doctors, what I solicited from those doctors, the strangleholds that I had to fight with and come to grips with, the work that [Oshman] did, in connection with that."

■ Such a discharge does not constitute a breach of contract for the reason that it is a basic term of the contract, implied by law. However, an attorney discharged with or without cause is entitled to recover, in quantum meruit, the reasonable value of services rendered up to the time of the discharge. (*Id.*, at p. 791.)

Appellants, who voluntarily withdrew from representing respondents, now wish to extend the policy laid down in *Fracasse*.

Subsequent to the *Fracasse* decision, only two California cases, *Hensel* v. *Cohen* (1984) 155 Cal.App.3d 563 [202 Cal.Rptr. 85], and *Pearlmutter* v. *Alexander* (1979) 97 Cal.App.3d Supp. 16 [158 Cal.Rptr. 762], have analyzed whether an attorney who voluntarily withdraws from a contingency fee contract is entitled to recover attorney's fees from his client's subsequent recovery.[8] Appellants wish to distinguish *Hensel* v. *Cohen,* and rely heavily upon *Pearlmutter* v. *Alexander,* decided by the Appellate Department of the Superior Court of Los Angeles County. ■ We are not bound by *Pearlmutter* (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 777, p. 747) and, to the extent that it is inconsistent with the views expressed herein, we decline to follow its holding.

In *Pearlmutter,* the court held that a client's failure to accept a settlement was justification for the attorneys' withdrawal, entitling them to recover attorneys' fees on the basis of the written lien executed by their clients. In dicta, the court concluded that the standard applied when a client discharges an attorney similarly applies to a case in which an attorney voluntarily withdraws;[9] we reject this conclusion.

---

[8]Prior to the *Fracasse* decision, in *Moore* v. *Fellner* (1958) 50 Cal.2d 330 [325 P.2d 857], in dicta, our Supreme Court recognized the principle that "an attorney who wrongfully abandons or withdraws from a case which he has contracted to handle, or has been discharged for cause by the client, may not recover compensation [citations]." The court noted that "this approach appears to have grown in part from situations in which the contract of employment was considered to be entire and indivisible." (*Id.,* at p. 341.)

We note in passing that, to the extent that it is inconsistent, *Moore* is overruled by the *Fracasse* decision. In analyzing whether an attorney discharged by the client was entitled to recover fees, the *Moore* court focused on whether the discharge was for cause, and whether the contract was divisible. However, the analysis in the *Moore* decision is dubious in view of the court's subsequent analysis in the *Fracasse* case, which did not consider divisibility of the contract as a factor, and specifically rejected cause as a factor when an attorney is discharged. "In summary, we hold that an attorney discharged with or without cause is entitled to recover the reasonable value of his services rendered to the time of discharge. Cases to the contrary, commencing with *Baldwin* v. *Bennett* [1854] 4 Cal. 392, are overruled." (*Fracasse* v. *Brent, supra,* 6 Cal.3d at p. 792.)

[9]In allowing the attorney to recover on his lien, the *Pearlmutter* court reasoned, "While the trial court found that plaintiff was under no legal compulsion to withdraw from the case, there is no finding that his withdrawal was improper.... [¶] We see no reason to differentiate between the situation where the attorney is discharged and where the attorney is allowed to withdraw insofar as continuation of the attorney's written lien for fees is involved." (*Pearlmutter* v. *Alexander, supra,* 97 Cal.App.3d Supp. at p. 20.)

The court in *Hensel, supra,* 155 Cal.App.3d at page 568, specifically rejected the rubric of *Pearlmutter,* and embraced the general rule followed in other jurisdictions: recovery for services in quantum meruit is allowed only when the attorney has *justifiable* cause for withdrawing. An attorney who voluntarily abandons a case without good cause will be denied compensation. (*Id.,* at p. 567, citing 7 Am.Jur.2d, Attorneys at Law, §§ 262-266, pp. 298-303, Annot. (1978) 88 A.L.R.3d 246, § 2.)

In *Hensel, supra,* 155 Cal.App.3d 563, the Cohen law firm filed a personal injury suit on behalf of Hensel. When efforts to obtain witnesses failed and the defendant's insurance company showed no interest in offering settlement, Cohen advised Hensel that the firm wished to withdraw from the case. Hensel engaged alternative counsel and subsequently settled the case. Finding that the firm was not justified in its withdrawal, the Court of Appeal denied recovery of attorneys' fees through enforcement of the written lien signed by Hensel.

Appellants argue that *Hensel* is distinguishable on the basis that the attorneys in *Hensel* expended merely 25 hours on the case before their withdrawal, compared to appellants' extensive investigation and discovery during a 4-year period. Appellants' emphasis is misplaced. In our view, the crucial element is the existence of a justifiable reason for withdrawing, not the quantity of time expended.

Appellants contend that once a trial court grants an attorney's motion to withdraw, cause for withdrawal has been established for the purpose of awarding attorneys' fees. We disagree. As the court noted in *Hensel,* "employing the proper procedure in withdrawing from a case is not synonymous with withdrawal for justifiable cause." (*Id.,* at p. 568.) To protect the best interests of the client, a trial court should have broad discretion in allowing attorneys to withdraw. In the case at bar, the court granted appellants' motion to withdraw on the basis that the relationship between the parties had completely broken down. It was not relevant who caused the breakdown for the purposes of determining whether appellants should be allowed to withdraw, but rather, the trial court's concern focused on the effects the rift would have on respondents' legal representation.

While a personality clash between the parties may provide good reason for allowing the attorney to withdraw, it is not necessarily a justifiable reason for purposes of awarding fees.

II

*Attorneys May Be Entitled to Quantum Meruit Recovery if They Withdraw in Adherence to Ethical Mandates*

To date, no court has addressed the question of whether an attorney's voluntary withdrawal, motivated by an adherence to professional ethical codes, constitutes a justifiable cause so as to permit a recovery of compensation.

Two crucial factors must be present for appellant to prevail. ■ First, we must conclude that withdrawal for ethical reasons justifies an award of attorneys' fees; an attorney who withdraws voluntarily without cause forfeits recovery for services performed. (*Hensel* v. *Cohen, supra,* 155 Cal.App.3d at p. 567.) Second, the facts in the instant case must be sufficient to establish that appellants did in fact withdraw for a justifiable reason.

Business and Professions Code section 6068, subdivision (c), specifies that an attorney has a duty to maintain only such actions, proceedings or defenses as appear to him or her to be legal or just.[10] Our Supreme Court has commented that " '[w]hen an attorney loses faith in his cause he should either retire from the case or dismiss the action.' " (*Kirsch* v. *Duryea* (1978) 21 Cal.3d 303, 309-310 [146 Cal.Rptr. 218, 578 P.2d 935, 6 A.L.R. 4th 334], citing *Larimer* v. *Smith* (1933) 130 Cal.App. 98, 101 [19 P.2d 825].)[11]

Appellants argue that an attorney hired under a contingent fee agreement who determines that a case is meritless, and thus withdraws from the case for ethical reasons is entitled to recovery in quantum meruit. In considering the merits of appellants' position, our concerns focus on two undesirable consequences of such a position.

First, attorneys faced with failing claims may attempt to abandon a losing cause under the guise of an ethical duty, hoping later to collect their fees if the client eventually recovers at trial or through settlement. As the court aptly stated in *Hensel, supra,* 155 Cal.App.3d at page 564, an attorney employed

---

[10]Additionally, Rules of Professional Conduct, rule 2-111(C) provides for *permissive* withdrawal when the client insists upon presenting a claim that is not warranted under existing law and cannot be supported by good faith argument for extension, modification, or reversal of the law. Rule 2-110(B) provides that a member of the State Bar shall not accept employment to present "a claim or defense in litigation that is not warranted under existing law, unless it can be supported by good faith argument of an extension, modification or reversal of existing law."

[11]We refrain from determining the corollary issue of whether an attorney who is ethically prohibited from proceeding to trial in a case the attorney believes lacks merit is similarly prohibited from settling the case.

on a contingency fee basis may not "determine that it is not worth his time to pursue the matter, instruct his client to look elsewhere for legal assistance, but hedge his bet by claiming a part of the recovery if a settlement is made or a judgment obtained . . . ."

Secondly, appellants' position would require trial courts to weigh the veracity of the attorney's contention of an ethical motivation against the possibility that counsel's withdrawal was motivated by a desire to reduce counsel's own losses. Both motivations may well co-exist in the minds of counsel faced with a "meritless" case. The trial judge is faced with the dilemma of determining the proportions of these two desires: ethical versus financial motivation.

As Professors Hazard and Hodes have noted, "[i]t is impossible to look into a lawyer's head, and it is unacceptable simply to take his word for his state of mind when the probity of his own conduct is at issue." (Hazard & Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct (1986 supp.) p. 342.) However, we must balance these considerations with the inequities which would result if attorneys compelled to withdraw from cases by the provisions of ethical codes, through no fault of their own, were denied the ability to recover compensation.

 Noting the difficulty facing a trial court in making a factual determination of an attorney's motivation, we nonetheless find that an attorney's withdrawal in adherence to ethical mandates is justified, entitling counsel to recover attorney's fees in quantum meruit. But, the attorney has the burden of proof to show: (1) counsel's withdrawal was mandatory, not merely permissive, under statute or State Bar rules;[12] (2) the overwhelming and primary motivation for counsel's withdrawal was the obligation to adhere to these ethical imperatives under statute or State Bar rules; (3) counsel commenced the action in good faith; (4) subsequent to counsel's withdrawal, the client obtained recovery; and (5) counsel has demonstrated that his work contributed in some measurable degree towards the client's ultimate recovery.[13]

---

[12]See, e.g., Business and Professions Code section 6068, subdivision (c). Compare Rules of Professional Conduct, rule 2-111(C) (permissive withdrawal) and rule 2-110(B) (mandatory withdrawal).

We do not rule out the possibility of awarding fees to an attorney who withdraws under permissive withdrawal provisions of State Bar rules or statute. In cases involving permissive withdrawal it is within the discretion of the trial court, with heightened scrutiny consistent with the standards articulated here, to determine whether counsel's withdrawal was justified for the purpose of awarding fees.

[13]This is not intended to be an exhaustive list of considerations which a trial court must utilize.

### A. *The Trial Court's Determination That Appellants Did Not Have Ethical Cause for Withdrawal Is Supported by Substantial Evidence*

In denying appellants' petition, the trial court determined that the case was not, in fact, meritless, and further rejected appellants' contentions that their withdrawal was motivated by appellants' ethical duties.[14]

 The trial court's conclusion that the case was not meritless is supported by substantial evidence.

Despite the opposing parties' knowledge of Dr. Reynolds's deposition testimony and appellants' belief that the case lacked merit, all parties to the will contest action subsequently entered into a settlement agreement in which the five contesting sisters received 36 percent of the net balance of the estate.[15]

Appellants did not consistently argue that the will contest was completely meritless. Appellants stated in their petition for attorneys' fees, that after fully explaining to the four sisters the liability aspects of the case, they refused to settle "in spite of [appellants'] advice that, in view of the very questionable liability, the proposed settlement amount was, in [appellants'] opinion, *far greater than any possible recovery that could be obtained in the trial of the Contest action.*" (Italics added.)

Appellants simultaneously argued that Dr. Reynolds's testimony "pulled out the final vestiges of *any* hope" that respondents could prevail at trial. (Italics added.) However, the credibility of Dr. Reynolds, one of a number of doctors who examined the decedent, and the totality of the circumstances

---

[14]Turning first to the provisions in the contract allowing for withdrawal, the trial court noted that the only right to withdraw established by contract was in the event there were insufficient assets in the estate: "There is nothing said in here about anything else except that. So, consequently, we then have the only other thing, and that is the right to withdraw for cause.

"Notwithstanding what Mr. Oshman and Mr. Hobart say, I am very clear in my mind that what happened at some point in time was that [appellants came] to the realization that this case, from a proof standpoint, was not the case that we [*sic*] had hoped it to be.

" . . . . . . . . . . . . . . .

"[W]hen the . . . four ladies refused to relieve the two attorneys, it was necessary that a motion be filed in this court. . . . [C]onsiderable length was taken in setting forth the position that the research, the discovery that was done in this case, led the attorneys to believe that they did not have the triable case that they were hoping for.

"I don't want to use the word 'weak case' or 'no case,' but at least it wasn't what we [*sic*] had expected it would be."

[15]Subsequent recovery cannot, in itself, rebut counsel's allegations of cause for withdrawal on the basis of a meritless case, for the simple reason that counsel may *only* recover if their client subsequently recovers. However, the amount of the recovery and the facts which gave rise to the clients obtaining the recovery are valid considerations to be weighed by the trial court in determining whether counsel's withdrawal was justified.

under which the decedent executed his will, were ultimately questions of fact to be determined by the trier of fact.

Appellants' inconsistent contentions regarding the validity of respondents' case was a factor to be considered by the trial court in making a factual determination as to appellants' motivation for withdrawal. The presumption on appellate review favors the correctness of the judgment, and where there is a conflict in the evidence and the inferences to be drawn therefrom, an appellate court is bound to accept as true the evidence and inferences in accordance with the findings of the lower court. (*Price* v. *Hibbs* (1964) 225 Cal.App.2d 209, 216 [37 Cal.Rptr. 270].) We find the trial court's factual determination to be supported by substantial evidence.

### III

*A Client's Refusal to Settle Cannot in Itself Constitute Cause for Withdrawal*

Appellants cite *Pearlmutter* v. *Alexander, supra,* 97 Cal.App.3d Supp. 16, in contending that respondents' refusal to settle justified their withdrawal. As noted, we disagree with *Pearlmutter*.

 A client's right to reject settlement is absolute.[16] To hold otherwise would deprive the client of his due process right to proceed to trial on the merits.[17] The exercise of the right to reject settlement is implicit in the contract between a client and an attorney, and cannot constitute a breach of contract. This right is irreconcilable with the rule espoused in *Pearlmutter*. A client's exercise of this right cannot constitute cause for the purpose of awarding attorneys' fees.[18]

---

[16]An attorney may not surrender any substantial right of a client contrary to his instructions or declared desires (*Kohr* v. *Kohr* (1963) 216 Cal.App.2d 516 [31 Cal.Rptr. 85]) and may not compromise the client's case without the client's knowledge and express consent. (1 Witkin, Cal. Procedure (3d ed. 1985) Attorneys, § 194, pp. 221-222.) See also, American Bar Association, Model Rules of Professional Conduct, rule 1.2(a): "A Lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter."

[17]Our finding is limited to an analysis of the relationship between attorney and client. We have not considered the consequences facing a client who refuses to accept a good faith settlement, including the possibility of a levy of sanctions.

[18]We note other jurisdictions which have adopted the rule. (See *Borup* v. *National Airlines* (S.D.N.Y. 1958) 159 F.Supp. 808, 810 ["[t]he mere fact that clients refuse to accept a settlement recommended by the attorney is not ground for his withdrawal"]; *Burston* v. *Pinkis* (1941) 25 N.Y.S.2d 12, 13 ["[t]he exercise of a client's unfettered right to refuse a settlement secured by his attorney . . . does not warrant the latter's withdrawal from the case"]; *Holmes* v. *Evans* (1891) 129 N.Y. 140 [29 N.E. 233] [withdrawal after client refused settlement constituted voluntary abandonment, attorney forfeited compensation]; *Suffolk Roadways, Inc.* v. *Minuse* (1968) 56 Misc.2d 6 [287 N.Y.S.2d 965, 966] ["[r]efusal of a client to accept a settlement offer, even though favored by his attorney, is not cause for withdrawal by the attorney"].)

## IV

*An Attorney May Be Entitled to Recover Under a Theory of Unjust Enrichment if a Client Who Repudiates Settlement Later Accepts the Terms Negotiated*

■ While a client's exercise of the right to reject settlement is not cause for withdrawal, a client should be required to make restitution to the attorney, under a theory of unjust enrichment, if the client subsequently accepts settlement terms substantially similar to those negotiated by the attorney prior to his or her withdrawal.

In the case at bar, respondents were not unjustly enriched by the settlement they entered into six months after appellants' withdrawal. ■ The trial court's finding that the settlement entered into was not the direct result of appellants' labor is supported by substantial evidence.

Appellants never solidified any settlement with the opposing parties. They merely offered settlement on behalf of four of the five sisters at a rate of 50 percent, three days prior to receiving word from respondents denying that appellants had authority to negotiate settlement. The trial court concluded that the subsequent settlement agreement entered into by all five sisters was not a direct result of the settlement efforts made by appellants, but rather was the result of six weeks of negotiations, supervised by the trial judge, in which respondents appeared in propria persona. The trial judge had first-hand knowledge of the proceedings in their entirety, and was in a superior position to evaluate the circumstances which led the parties to enter into the settlement agreement. On review, we find no error in this factual determination.

## V

*Substantial Evidence Supports the Trial Court's Finding That Respondents' Conduct Did Not Justify Appellants' Withdrawal*

■ Appellants argue that their withdrawal was justified by respondents' failure to cooperate. Other jurisdictions have recognized, under some instances, that an attorney who cannot obtain the cooperation of a client may be justified in withdrawing from the case and entitled to recover compensation. (See Annot. (1978) 88 A.L.R.3d 246, § 7, p. 260.)[19]

---

[19]See *Borup v. National Airlines, supra,* 159 F.Supp. 808, 810 (clients' delays and lack of diligence made attorneys' duties unreasonably onerous, but, "[t]he mere fact that clients refuse to accept a settlement recommended by the attorney is not ground for his withdrawal"); *Ambrose v. Detroit Edison Company* (1975) 65 Mich.App. 484 [237 N.W.2d 520, 88 A.L.R.3d 239] (client's total failure to cooperate constituted cause for withdrawal); *Dempsey v. Dorrance* (1910) 151 Mo.App. 429 [132 S.W. 33] (client refused to speak to counsel, amounting to wrongful discharge); *Irwin v. Baruch* (1946) 60 N.Y.S.2d 223 (plaintiff/attorney was unwilling to relinquish authority to his retained counsel).

In their motion to withdraw, appellants contended that respondents refused to cooperate, claiming that one of their clients stated that she would not testify unless her transportation was paid for by appellants; that respondents denied appellants permission to incur jury fee and medical expert witness expenses; and that Mrs. Decker told appellants " 'your contract with us requires you to pay the costs of litigation.' "

Appellants further contend that respondents' failure to take their advice regarding settlement constitutes failure to cooperate. Given that it was respondents' absolute right to refuse settlement, it would be anomalous to hold that their refusal to settle constitutes lack of cooperation sufficient to award attorneys' fees in quantum meruit.

Appellants' motion to withdraw was granted on the basis that the attorney-client relationship had completely broken down. It is clear from the record that there was mutual animosity between appellants and respondents. The harsh tone of Hobart's letters to respondents understandably did not improve their compatibility.

Adding to the troubled relationship was the dispute which arose over the attorneys' fees specified in the contract. In all likelihood the fees specified in the contract would have been substantially greater than any recovery gained by respondents. It does not appear from the record that this dispute was ever resolved.

It is reasonable to conclude that these factors adversely affected respondents' ability, and desire, to cooperate with appellants.

The decision as to whether an attorney's lien should be imposed lies within the trial court's discretion. On review, we must resolve all conflicts in favor of the respondents, and indulge all legitimate and reasonable inferences to uphold the verdict. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) We find no abuse of discretion in the trial court's implicit finding rejecting the contention that respondents' lack of cooperation justified appellants' withdrawal.

DISPOSITION

The order is affirmed.

Klein, P. J., and Arabian, J., concurred.