1997-NMSC-030

943 P.2d 104

**SANDERS, BRUIN, COLL & WORLEY, P.A., Plaintiff,**

v.

**McKAY OIL CORPORATION; McKay Childrens Trust, New Mexico Gas Marketing, Inc., McKay Living Trust, Sanders Petroleum Corporation, McKay Drilling Partners, Inc., Petro Grande Corporation, and Talent Energy Corporation, Defendants–Counterclaimants–Appellants.**

v.

**Steven P. FISHER, Michael T. Worley, Charles H. Coll, Richard L. Kraft, and Sanders, Bruin, Coll & Worley, P.A., Counterdefendants–Appellees.**

No. 23479.

Supreme Court of New Mexico.

June 18, 1997.

Thomas J. Horan, Albuquerque, William G. Gilstrap, P.C., William G. Gilstrap, Albuquerque, for Plaintiffs–Appellants.

Rodey, Dickason, Sloan, Akin & Robb, P.A., John M. Brant, R. Nelson Franse, Jeffrey M. Croasdell, Albuquerque, for Defendants–Appellees.

## OPINION

BACA, Justice.

1. Upon certification from the Court of Appeals pursuant to NMSA 1978, Section 34–5–14 (Repl.Pamp.1996), Roy L. McKay and his corporate entities (collectively referred to as "McKay") seek review of a district court order granting summary judgment in favor of Appellees Fisher, Worley, Coll, and Kraft. This Court now considers whether the trial court properly granted the motion. We hold that the summary judgment motion should not have been granted, and therefore we reverse and remand the case to the trial court for hearing.

### I.

2. During the 1990's, Roy McKay, owner of McKay Oil Corporation, used the law firm of Sanders, Bruin, Coll & Worley, P.A. ("the firm") to represent him in a number of matters involving his corporate interests. The firm was organized as a professional corporation under the laws of New Mexico at all times relevant to this case. Prior to the events causing the current dispute, the firm was preparing to defend McKay against a multi-million dollar claim. One of the firm's attorneys, Damon Richards, acted as primary counsel for McKay, preparing for an arbitration which would be one of the first proceedings in the multi-million dollar claim.

3. Approximately six weeks before Richards was to represent McKay in the arbitration, four of the firm's five attorney-shareholders held a meeting and concluded that they would terminate McKay as a client and end all firm representation, including Richards' work in the forthcoming arbitration.

Richards was the only attorney-shareholder not present at this meeting.

4. Pursuant to this decision, the firm sent McKay a letter notifying him of the termination. The letter cited Richards' alleged health concerns, his inability to serve as lead counsel, and the firm's inability to continue the representation as reasons warranting the termination. The letter was signed by the five attorney-shareholders of the firm, including Richards. The facts suggest that Richards did not agree with the termination, but he signed the letter under an alleged threat that he might be fired if he did not sign the letter.

5. Upon receipt of the letter, McKay sought and secured other counsel for the pending case. After his new counsel received an extension of the arbitration date, and after a lengthy trial, McKay was successful in his defense.

6. In August of 1994, the firm filed an action against McKay seeking collection of unpaid attorneys fees stemming from the work it allegedly had done in McKay's case prior to the termination. McKay then filed a counterclaim asserting that the firm and its individual shareholders wrongfully terminated representation of McKay and breached an employment contract entered into by the parties. McKay also alleged that these actions rose to the level of malpractice. He therefore sought recovery from both the firm as a corporation as well as from each of the individual attorneys.

7. After depositions of the principals were taken, Fisher, Worley, Coll, and Kraft jointly filed a Motion for Summary Judgment which was granted by the trial court. The court found that the termination of the relationship between the firm and McKay was a corporate act for which the lawyers would not have individual liability. McKay's suit against the firm remains pending.

8. Timely notice of appeal was filed, and certification to this Court was sought by the Court of Appeals, asserting that the case presented issues of substantial public interest. Upon certification, we now review two primary issues: 1) whether attorneys can limit liability to clients while practicing with-

in a professional corporation and whether the conduct of the attorneys in this case is of the type that should be shielded by corporate status, and 2) whether the trial court erred in granting the firm's summary judgment motion on the basis that no grounds for personal liability on the part of the attorney-share-holders could be found.

9. We hold that, as a general matter, membership or shareholder status in a professional corporation does not shield an attorney from individual liability for his own mistakes or professional misdeeds. However, it remains unclear from the record whether the actions taken by the attorney-shareholders in this case rose to the level of a breach of duty of any type. Therefore, we reverse the trial court's grant of summary judgment, finding material issues of fact exist as to whether the attorney-shareholders should be personally liable for their actions regarding the representation of McKay.

## II.

10. Appellees contend that the termination of McKay should be characterized only as a "decision to terminate a business relationship," amenable to an action sounding in contract. We disagree. The termination of McKay necessarily involved a legal component substantially related to representation and cannot be classified merely as a business act.

11. In the immediate case, four of the five attorney-shareholders met and discussed the termination of McKay. In the end, all five signed the letter terminating the representation. The practical result of this action was that McKay was without legal representation six weeks before his legal proceedings were to begin. McKay was forced to seek and secure other counsel on very short notice. He was also in the difficult position of wondering whether a new attorney would have time to prepare his case and whether his interests would be adequately protected.

12. The significant regulation of the process of termination by the courts suggests that termination substantially affects legal representation. *See* Rule 16–116(B) NMRA 1997 (outlining the permissible parameters for attorney withdrawal from representation and stating that "a lawyer may withdraw from representing a client if withdrawal can be accomplished without material adverse effect on the interests of the client" and that "a lawyer shall take steps [in terminating] to the extent reasonably practicable to protect the client's interests...."). This seems intuitively correct since termination necessarily means that a client will no longer have representation or might not enjoy the continuity of representation that might best address his claims.

13. Both decisions from this Court and from other jurisdictions demonstrate the impact of termination on representation and the substantial control the courts exercise over the process. *Cf. In re Kelly*, 119 N.M. 807, 808–09, 896 P.2d 487, 488–89 (1995) (holding that failure to protect client interests at termination was a factor warranting disbarment); *In re Sparks*, 108 N.M. 249, 251, 771 P.2d 182, 184 (1989) (holding that disorderly termination of attorney-client relationship, along with other factors in representation, warranted suspension from the practice of law); *Karlsson & Ng P.C. v. Frank*, 162 A.D.2d 269, 556 N.Y.S.2d 626 (1990) (discussing the need for specific act of termination in ending representation); *State v. Cummings*, 199 Wis.2d 721, 546 N.W.2d 406, 416–18 (1996) (setting court's conditions for withdrawal from the attorney-client relationship at issue in the case).

14. In addition to the courts' recognition of the effects of termination on representation, other cases demonstrate that termination or withdrawal, carried out negligently, can serve as a basis for malpractice claims. *See Wood v. Parker*, 901 S.W.2d 374, 379 (Tenn.Ct.App.1995) (discussing a legal malpractice claim based on alleged negligent withdrawal); *see also Kirsch v. Duryea*, 21 Cal.3d 303, 146 Cal.Rptr. 218, 222–23, 578 P.2d 935, 939 (1978) (en banc) (same).

15. While no New Mexico case specifically addresses negligent withdrawal/termination as a basis for malpractice, our holding in *Leyba v. Whitley*, 120 N.M. 768, 907 P.2d 172 (1995), supports a finding that attorney-client relationship termination is well within the scope of legal representation and subject

to malpractice claims. In *Whitley*, this Court indicated that attorneys could potentially be found liable for malpractice where they fail to act reasonably to ensure payment of verdict proceeds to the correct party. *Id.* at 778, 907 P.2d at 182. This clearly suggests that, as an aspect of representation, payment of proceeds implicates tort duties of care. We believe that the process of termination stands on equal, if not superior, footing with payment of proceeds in the scope of legal representation. Thus, when an attorney carries out, or participates in, the termination of an attorney-client relationship, the attorney is under a duty to act with reasonable care, in full consideration of the rights of the client.

■ 16. Appellees contend that the Rules of Professional Conduct governing withdrawal cannot be used to launch a malpractice claim. We agree that the Rules of Professional Conduct cannot be used as a basis for civil liability. *See Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 762, 750 P.2d 118, 123 (1988). However, such professional rules still provide guidance in ascertaining the extent of lawyers' professional obligations to their clients. *See Parker*, 901 S.W.2d at 379. Thus, while the rules governing withdrawal will not serve as a basis for civil liability, neither should a malpractice claim be barred because its substance enters the realm of conduct covered under the Rules of Professional Conduct.

■ 17. As the Appellees contend, we believe that a decision to end a contractual agreement establishing legal representation involves some business aspect and consideration of, *inter alia*, the well-being of the corporation and financial implications. We merely hold that such considerations will not erase the significance of decisions substantially affecting a party's legal representation. Such alleged breaches of duty by professionals may sound in tort as well as contract. *See Whitley*, 120 N.M. at 772, 907 P.2d at 176 (recognizing that claims for professional services negligently performed can be brought under contract, but noting that such claims generally lie in tort); *see Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex.1988) (classifying

breaches of duty by professionals as being in the nature of tort claims).

## III.

■ 18. Appellees contend that terminating McKay should be characterized only as the act of a corporate body and that no component of individual conduct or decision-making is relevant to this inquiry. We disagree. While terminating McKay might be considered an act of the corporation, the record contains evidence showing that each attorney-shareholder individually and substantially participated in the termination to the extent that each necessarily involved himself in the attorney-client relationship with McKay. Furthermore, we hold that professional corporate status was not intended to confer, nor does it confer, upon an attorney-shareholder a limitation on liability for the attorney's own improper behavior or malpractice, even in the context of corporate activities and decisions.

19. It might be argued that McKay retained each of the five attorney-shareholders when he retained the firm. *See George v. Caton*, 93 N.M. 370, 375, 600 P.2d 822, 827 (Ct.App.1979). As such, each member of the firm arguably would be responsible for his own ethical and professional duties to McKay. However, we decline to rely on this application of *Caton* in this instance. Instead, we premise our decision upon the individual participation of each of the attorneys in the termination of McKay, and thus each attorney's involvement in the attorney-client relationship, as furnishing a basis for implicating the attorneys' ethical and professional duties to the client.

20. The attorney-shareholders in the immediate case personally and substantially participated in the termination of McKay. The facts indicate that aside from Richards' absence at the meeting and his alleged disagreement with the outcome, each attorney individually had the opportunity to consider the action, decide whether the action should be undertaken, and elect to sign his name to the termination letter. In sum, we think it is clear that each of the attorney-shareholders had substantial participation in the decision to terminate. *See Grayson v. Jones*, 101

Nev. 749, 710 P.2d 76, 77 (1985) (holding that for plaintiff to sue members of professional legal association for malpractice, evidence must be presented that attorneys participated in representation); *see also Krouner v. Koplovitz*, 175 A.D.2d 531, 572 N.Y.S.2d 959, 962 (1991) (same).

21. The more crucial question is whether the attorney-shareholders should be shielded from personal liability for their participation in the termination. We conclude that they should not receive such protection in this instance.

22. Professional corporations were never intended to protect attorneys from their own misdeeds. The extent of intended protection afforded in this instance can be gleaned first by examining the origins of the professional corporation. Traditionally, attorneys were ʼnot permitted to incorporate their practice of law because many courts believed it was necessary to preserve to the client the benefits of a highly confidential relationship based on personal confidence, ability, and integrity. *See In re Florida Bar*, 133 So.2d 554, 556 (Fla.1961). Incorporation was seen as possibly detracting from the professional accountability of an attorney. *Id.* However, barring attorneys from incorporating had the unintended consequence of denying attorneys several significant tax, insurance, and business-related benefits. *Id.* at 555; *see also State ex rel. Wise, Childs, and Rice Co. v. Basinger*, 54 Ohio App.3d 107, 561 N.E.2d 559, 561–62 (1988). To address this problem, most jurisdictions eventually passed legislation to enable members of the bar to form professional corporations. *See, e.g.,* NMSA 1978, §§ 53–6–1 to –14 (Repl.Pamp.1983); *In re Florida Bar*, 133 So.2d at 556.

23. As professional corporations became commonplace on the business and legal landscape, courts often disagreed about the shareholder or member liabilities for contractual and purely business obligations. *See We're Associates Co. v. Cohen, Stracher & Bloom, P.C.*, 103 A.D.2d 130, 478 N.Y.S.2d 670 (1984) (holding that shareholders of a professional corporation have the same insulation from liability as shareholders of other corporations with respect to obligations of a purely business and nonprofessional nature);

*but see South High Dev., Ltd. v. Weiner, Lippe & Cromley Co., L.P.A.*, 4 Ohio St.3d 1, 4 O.B.R. 1, 445 N.E.2d 1106, 1108 (1983) (per curiam) (finding that there is no necessity for limited liability as to the contractual obligations of a professional service corporation); *see generally* Eliot J. Katz, Annotation, *Professional Corporation Stockholders' Non-malpractice Liability*, 50 A.L.R.4th 1276 (1986).

24. However, throughout these disputes, the professional duties owed by those acting as professionals within a corporation did not change. NMSA 1978, Section 53–6–8 (Repl. Pamp.1983) states:

> The Professional Corporation Act ... does not modify the legal relationships, including confidential relationships, between a person performing professional services and the client or patient who receives such services; but the liability of shareholders shall be otherwise limited as provided in the Business Corporation Act ... and otherwise as provided by law.

The clear majority of jurisdictions construing such statutes and duties have held that professional corporations provide no protection from personal liability for an attorney's own malpractice or obligations individually incurred by a breach of duty. *See In re Florida Bar*, 133 So.2d at 556–57; *First Bank & Trust Co. v. Zagoria*, 250 Ga. 844, 302 S.E.2d 674, 675 (1983), *overruled on other grounds, Henderson v. HSI Fin. Servs., Inc.*, 266 Ga. 844, 471 S.E.2d 885 (1996); *Schnapp, Hochberg & Sommers v. Nislow*, 106 Misc.2d 194, 431 N.Y.S.2d 324, 325–26 (Sup.Ct.1980); *Basinger*, 561 N.E.2d at 562.

25. In the case of *In re Florida Bar*, members of the Florida Bar requested approval by the courts of certain amendments to the Florida rules governing attorney ethics so that attorneys would be permitted to form professional corporations. *In re Florida Bar*, 133 So.2d at 554. The court approved the amendments, but also made a seminal ruling regarding the continuing responsibilities of individual attorneys who choose to join such professional entities:

> [T]he highly personal obligation of the lawyer to his client is in no way adversely affected. The individual practitioner,

whether a stockholder in a corporation or otherwise, will continue to be expected to abide by all of the Rules and Canons of professional ethics.... [T]he corporate entity as a method of doing business will not be permitted to protect the unfaithful or the unethical.

*Id.* at 556.

26. In *Zagoria*, the Supreme Court of Georgia reviewed the question of whether an attorney-shareholder in a professional corporation could be held personally liable for the professional misdeeds of another attorney in the corporation where the first attorney had no role in the alleged malpractice. *Zagoria*, 302 S.E.2d at 674. In its holding, the court concluded that the attorney-shareholder could be held personally liable for the acts of the second attorney. *Id.* at 675. While this holding was later overruled to the extent that it imposed liability on all attorney-shareholders for the malpractice of one, *see Henderson*, 471 S.E.2d at 886, Georgia still follows the rule that an attorney is liable for his own malpractice, *see id.*

27. We hold that shareholder or membership status within a professional corporation is not intended to confer upon an attorney protection from individual liability for the attorney's own negligence or personal breach of duty. As noted in the previous sections, the record indicates each of the attorney-shareholders in this case participated in a decision substantially affecting McKay's representation. We therefore conclude that each attorney's shareholder status in the professional corporation did not shield him from potential liability for alleged malpractice related to his own actions.

28. McKay contends that even if the facts in this case did not involve a professional corporation, general tort and corporate law principles support a finding that a suit for personal liability is permissible in this instance. *See Lobato v. Pay Less Drug Stores, Inc.,* 261 F.2d 406, 408–09 (10th Cir.1958) (finding that officer or agent status in corporation will not expose one to personal liability but that such status will not shield corporate actors from personal liability for wrongful acts in which they participate); *Bourgeous v. Horizon Healthcare Corp.,* 117 N.M. 434, 437, 872 P.2d 852, 855 (1994) (holding that officers and employees of corporations can be held personally liable for intentional torts); *Stinson v. Berry,* 123 N.M. 482, 943 P.2d 129 (Ct.App.1997) (holding that directors engaging in tortious conduct may be held liable even if they are acting within the scope of corporate duties); *Smith v. Isaacs,* 777 S.W.2d 912, 915 (Ky.1989) (finding that an officer who personally participated in a tort was personally liable, even though the corporation might also be liable under respondeat superior).

29. We do not deem it necessary to address this contention since our holding allowing for a finding of personal liability in this case is premised upon the duties and expectations which are commensurate with the practice of law. *See Caton,* 93 N.M. 370, 600 P.2d 822. As noted earlier, the attorney-shareholders substantially affected the representation of McKay in carrying out the termination, and we believe that by doing so, each was required to individually assess his legal and professional obligations. Therefore, each was responsible for his personal role in the final decision.

## IV.

30. We believe that summary judgment in this particular case was improperly granted. When the material facts are not in dispute and only the legal effect of the undisputed facts remains to be decided, summary judgment is the proper disposition of the issue. *See Ruiz v. Garcia,* 115 N.M. 269, 272, 850 P.2d 972, 975 (1993); *see also, Koenig v. Perez,* 104 N.M. 664, 666, 726 P.2d 341, 343 (1986). While the record indicates that each attorney was personally involved in the termination process in question, it remains unclear whether the actions taken by the attorney-shareholders in this case rose to the level of a breach of duty of any type. Thus, issues of material fact remain for determination in this instance.

## V.

31. We hold that the attorney-shareholders in the firm acted in the professional

capacity of an attorney by participating in the termination decision regarding McKay. In doing so, it was incumbent upon each attorney to consider the propriety of his individual actions, both in terms of its ethical implications and possible malpractice ramifications. While the professional corporation will provide limited protection for the misdeeds of fellow attorney-shareholders, it was not intended to shield an attorney from his own mistakes. For these reasons, the grant of summary judgment is reversed and the case remanded.

32. **IT IS SO ORDERED.**

SERNA, J., and PICKARD, Judge, concur.