[No. B008909. Second Dist., Div. Seven. Oct. 23, 1985.]

LEROY MARCUS ENRIQUEZ, Plaintiff and Respondent, v. DAVID ASHLEY SMYTH et al., Defendants and Appellants.

692

**COUNSEL**

Andrew Edward Smyth and David Ashley Smyth, in pro. per., for Defendants and Appellants.

Thomas E. Beck for Plaintiff and Respondent.

**OPINION**

**LILLIE, P. J.**—This is an appeal from judgment on a jury verdict in favor of plaintiff Leroy Enriquez and against defendants David Ashley Smyth, his law partner, Andrew Edward Smyth, and their law firm, Smyth and Smyth, in a legal malpractice action.

# I

## FACTS

Leroy Enriquez was living on a fixed income of approximately $425 per month, and had accumulated over $6,000 in debts. Concerned with his indebtedness, and based on an advertisement in the newspaper, he sought the advice of Attorney David Smyth regarding the possibility of filing bankruptcy. At their first meeting, in response to Smyth's questions, Enriquez named all his creditors and the amount owed to each; he also gave Smyth the address of his home, the amount he had paid for it eight years earlier, and the balance due on the mortgage, which at that time was $5,476. Smyth filled out worksheets with this information, and later had them typed as schedules for Enriquez' petition for bankruptcy which Smyth filed on his behalf in United States District Court. On both the handwritten worksheets and the typed schedules, the value of the home was listed as $30,000.

Enriquez appeared at the first meeting of creditors on his bankruptcy petition; Attorney Smyth did not appear. Given a choice of returning on a different date or taking the stand without counsel present, Enriquez chose to testify, and stated in response to the Trustee's question that his home was worth around $40,000. Soon after this appearance, Enriquez received the trustee's report of exempt property, wherein the Trustee refused to exempt the home as he found Enriquez had equity in it over and above the allowable homestead exemption; the Trustee had been advised that the home had a value in excess of $70,000. Enriquez called Smyth, who advised him to "wait around awhile and see what happens."

A few weeks later, Enriquez was adjudicated a bankrupt and $900 of debts, for which creditors had not presented claims, were discharged. At about the same time, the Trustee sent a second letter, reiterating the refusal to exempt the house and asking whether Enriquez wanted to retain possession of the house by purchasing the estate's interest in it. Again Enriquez sought his attorney's advice; Smyth told him to go out and get a fast loan for $10,000. While attempting to do so, Enriquez was served with a copy of the Trustee's application for court order to sell the estate's interest in the home.

Enriquez was unable to get a conventional loan, but finally arranged a loan for $10,000 with a mortgage company. The Trustee refused to accept the $10,000 payment, insisting on $12,000. The loan was increased accordingly, and $12,000 was paid to the Trustee, who released the estate's interest in the property. The Trustee retained $6,570 for payment to creditors and for costs, and returned the balance to Enriquez; Enriquez had also

received $1,359 from the mortgage company as a part of the loan. According to the terms of the loan, Enriquez was to pay interest only for two years, and make a balloon payment of $17,000 at the end of that period. Nineteen months later, not knowing how he could make the $17,000 balloon payment due shortly, Enriquez sold his home, paid off his loan and purchased another home.

Enriquez brought the within action in superior court against David Smyth and his law firm, alleging, inter alia, Smyth's legal malpractice in filing and handling his bankruptcy case. The jury returned a verdict in favor of plaintiff and against defendants in the amount of $15,000, and judgment was entered thereon. Defendants' motion for new trial and for judgment notwithstanding the verdict were denied, and this appeal followed.

## II

### SUFFICIENCY OF EVIDENCE

██ Appellant Smyth contends there was no substantial evidence to show that he negligently caused respondent to file bankruptcy, and more particularly, that no evidence supports the allegation that he negligently placed the $30,000 valuation on respondent's house in the bankruptcy petition. ██ " 'The general rule with respect to the liability of an attorney for failure to properly perform his duties to his client is that the attorney, by accepting employment to give legal advice or to render other legal services, impliedly agrees to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake. [Citations.]' " (*Kirsch* v. *Duryea* (1978) 21 Cal.3d 303, 308 [146 Cal.Rptr. 218, 578 P.2d 935, 6 A.L.R.4th 334].)

██ At trial, Helen Frazer, an attorney specializing in bankruptcy law, testified as to the standard of practice for a bankruptcy attorney in the community in which appellant practiced. Ms. Frazer testified that it is the usual practice, if a client does not know the value of his real property, for an attorney preparing a petition for bankruptcy to have the client seek an independent appraisal, most commonly by contacting a real estate broker familiar with the value of homes in that particular area, or by hiring an appraiser. Even if the client states what he feels is the value of the house, standard practice would be to make further inquiry as to the basis for this opinion, such as the sale price of comparable homes in the neighborhood, whether the client had received an offer on his property, or whether there had been a recent appraisal by a loan company.

Respondent testified at trial that during his first meeting with appellant, appellant asked him the value of his house. Respondent said he did not know the value, and asked appellant whether he ought to have the house appraised. Appellant said he knew the area fairly well and an appraisal wouldn't be necessary. Based on the location of the house, the size of the lot, and how much respondent paid for the house, appellant appraised the house at $30,000, listing that as the value on the bankruptcy schedule. This testimony was corroborated by respondent's girlfriend and his son, both of whom had been present with respondent in appellant's office during that initial meeting. Appellant himself testified that he had no particular knowledge of the value of houses in that area.

Although this evidence is not uncontradicted, appellant's counsel acknowledged to the jury that the whole case hinged on their determination of credibility of witnesses. ■ "It is not the function of the appellate court to weigh or resolve conflicts in the evidence or judge the credibility of witnesses." (*Drzewiecki* v. *H & R Block, Inc.* (1972) 24 Cal.App.3d 695, 705 [101 Cal.Rptr. 169].) "When a jury's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of the appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support that determination. Where, as here, two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deduction for those of the trier of fact. It is of no consequence that the trier of fact believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion. [Citation.]" (*Stark* v. *City of Los Angeles* (1985) 168 Cal.App.3d 276, 284-285 [214 Cal.Rptr. 216].)

■ There is sufficient evidence that appellant, by rejecting respondent's suggestion of an appraisal and by valuing the property himself without any expertise as to the value of real property and based only on general, very limited information, failed to use such skill, prudence and diligence as would a lawyer of ordinary skill and capacity in performing that task.

Due care in valuation of respondent's house would have disclosed that respondent had more equity in his home than could be protected under the bankruptcy laws. In such a case, according to Ms. Frazer, the bankruptcy trustee could sell the house, and use the nonexempt equity to pay off the filing party's debts. Where, as here, respondent's assets, including the nonexempt equity in the house, exceeded his debts, both Ms. Frazer and appellant himself testified that the client should be advised not to file a bankruptcy, but rather to seek some other way of dealing with his creditors. Respondent testified that prior to his first meeting with appellant he had no

intention of filing bankruptcy, but simply wanted advice; that appellant told him to bring in all his outstanding bills and home mortgage papers, took that information and summarily began to fill out the bankruptcy papers. Appellant did not discuss with respondent whether or not he wanted to or should file bankruptcy, did not inform respondent that if his assets exceeded his liabilities he shouldn't file bankruptcy, did not tell respondent that if he filed bankruptcy and his house was worth more than $30,000, the house might be sold, did not mention any liability or problem that could occur as a result of filing a bankruptcy or say anything against filing bankruptcy. There is substantial evidence that appellant negligently caused respondent to file bankruptcy.

■ The record also contains substantial evidence of appellant's subsequent negligence; he admittedly failed to appear with respondent at the first meeting of creditors and failed to advise the clerk of the court that he would be in another courtroom and to have the matter held until he returned, as is the standard of practice in the community. Respondent was thus left to take the stand without counsel. Following that court appearance, the Trustee notified respondent that he refused to exempt the family residence. Respondent's expert testified that based on the custom and practice in the legal community, a bankruptcy attorney faced with a similar dilemma has several alternatives; he can hire his own appraiser and challenge the appraisal of the Trustee; he can try to dismiss the bankruptcy and work out a repayment plan directly with the creditors; he can explore the possibility of a Chapter 13 repayment program; or he can work out an agreement with the Trustee to pay him the amount of the unsecured debt over time rather than have the property sold. Appellant did not pursue any of these alternatives, but simply asked the Trustee how much money he wanted and instructed respondent to find a loan for that amount. Appellant's handling of the bankruptcy proceeding clearly fell below the standard of care of the attorneys in his community.

### III

#### SELLING COSTS AS DAMAGES

■ Appellant next contends the $8,016.92 of costs incurred by respondent in selling his home were not proximately caused by the bankruptcy and should not have been included as damages in the jury verdict. An attorney's liability in a malpractice action as in other negligence cases, is for all damages directly and proximately caused by his negligence. (*Smith* v. *Lewis* (1975) 13 Cal.3d 349, 362 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231].) ■ "Proximate cause ' "is that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the

injury [or damage complained of] and without which such result would not have occurred." ' [Citation.]" (*Whitecombe* v. *County of Yolo* (1977) 73 Cal.App.3d 698, 708 [141 Cal.Rptr. 189].) The continuous causal chain is easy to follow in this case. The record shows that at the time he sought appellant's advice regarding his financial condition, respondent had approximately $6,000 in debts. He testified that none of his creditors were pressuring him at that time; there was therefore no imminent risk of forced sale of his house to pay his debts. There was also testimony that respondent might have been able to get an interest-free loan from his brother-in-law to pay those debts prior to his filing bankruptcy. Once appellant negligently valued respondent's house and caused him to file bankruptcy, the Trustee threatened sale of the house to pay the previously undemanding creditors unless respondent delivered to him $12,000 to cover any creditors' claims and costs. Respondent did not want to sell his house; on appellant's advice, and without the benefit of any alternatives appellant might have pursued, he therefore sought a loan of $12,000. The loan he was finally able to obtain required interest payments for two years, with a balloon payment of $17,000 due at the end of that period. Respondent testified that as the two-year period came to a close, he did not know how he could make the payment, and although he did not want to sell his house, he felt that was the only way he could meet his loan obligation. The house was sold, and sale costs incurred. The sale was necessitated by the loan, which was necessitated by the negligently-filed and negligently-handled bankruptcy, which resulted from the negligent valuation of respondent's house. Although the sale took place two years after appellant's initial negligence, it flowed directly from that negligence; the two-year time period was a product of the loan itself, which of course was a product of appellant's negligence. Under these facts, we find the costs of the sale are not too remote either in time or in causation to be included as damages proximately caused by appellant's negligence.

Appellant relies on *Savings Bk. of So. Cal.* v. *Asbury* (1897) 117 Cal. 96 [48 P. 1081], and *De Liere* v. *Goldberg, Bowen & Co.* (1916) 30 Cal.App. 612 [159 P. 197], for the principle that money lost from a plaintiff's inability to make mortgage payments by reason of financial difficulty caused by a defendant cannot be damages. In *Savings,* the basis for the action was a lender's failure to pay to the borrower the full amount agreed to in the mortgage agreement; the borrower sought to recover the damages he suffered by his inability to pay creditors from the expected loan proceeds. In *De Liere,* the plaintiff sought recovery for personal injuries, including the loss occasioned by her inability to make mortgage payments on some real property because of her injuries. Defendants in these cases had no involvement in the origin of the financial trouble and played no part in the advising or handling of the ensuing problems. In contrast, respondent in our case

specifically sought appellant's advice because he was concerned about his debts; he expressly asked appellant whether his house was in jeopardy. Appellant was retained to file bankruptcy for respondent because of these concerns. Appellant's subsequent negligence in handling the bankruptcy, which eventually necessitated the $17,000 loan, was neither remote nor unrelated to respondent's continuing financial difficulty. Appellant's negligence in fact exacerbated the indebtedness he was retained to resolve, changing the situation from one where respondent owed $6,600 to patient creditors to one where a trustee insisted on immediate payment of $12,000 and respondent had to "get a quick loan," without a choice of terms. The balloon payment which followed this escalation in financial troubles flowed directly from that negligence, and in light of respondent's meager fixed income and lack of any other sizeable assets, the sale of the house to meet this payment was foreseeable. Respondent's costs incurred in this sale were proximately caused by appellant's negligence.

## IV

### CALCULATION OF INTEREST DAMAGES

Appellant's final contention is that the interest damages were improperly calculated. Unfortunately, appellant did not seek a segregation of the elements of damage from the jury, and the jury was not required to do so without such request. (*Foley* v. *Martin* (1904) 142 Cal. 256, 261 [71 P. 165, 75 P. 842]; see also *Sharp* v. *Bragg Crane Service, Inc.* (1985) 168 Cal.App.3d 993, 995-996 [214 Cal.Rptr. 620].) Based on the general verdict in the record before us, it is impossible to ascertain, how much, if any, of the award was for interest damages suffered by respondent. We also note that respondent's counsel, in closing argument, asked the jury not to calculate any interest damages, to ignore any interest charges as damages. Not only is the record inadequate to review the question, but the claim is likely devoid of any merit.

### DISPOSITION

The judgment is affirmed.

Thompson, J., and Johnson, J., concurred.

A petition for a rehearing was denied November 12, 1985, and appellants' petition for review by the Supreme Court was denied January 15, 1986.