[No. A081931. First Dist., Div. Two. Oct. 31, 2000.]

CALIFORNIA STATE AUTOMOBILE ASSOCIATION INTER-INSURANCE BUREAU, Plaintiff and Appellant, v. PARICHAN, RENBERG, CROSSMAN & HARVEY, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B, C and D.

**COUNSEL**

Anthony & Carlson, Steven R. Anthony, Jane L. Trigero; Ropers, Majeski, Kohn & Bentley, Mark G. Bonino and Eva J. Yablonsky for Plaintiff and Appellant.

Meis, Alexander & Dean, Fred G. Meis; Hinshaw & Culbertson, Ronald E. Mallen and Paul E. Vallone for Defendant and Appellant.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

Defendant and appellant, Parichan, Renberg, Crossman & Harvey (Parichan) was sued for legal malpractice by plaintiff and appellant, California State Automobile Association Inter-Insurance Bureau (CSAA). A jury awarded CSAA $920,849.05 in damages. Parichan now argues that the trial court should have, but did not, instruct the jury to consider CSAA's legal malpractice claim under the case-within-a-case procedure, that the trial court erroneously instructed the jury that Parichan's knowledge of a crucial report could be imputed to CSAA, and that it erred in refusing to instruct the jury on CSAA's contributory negligence. CSAA also contends, in a cross-appeal, that the trial court erred in not awarding it prejudgment interest. We disagree with each of these contentions and, accordingly, affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Underlying Litigation: Carr v. Rosenberg*

On August 11, 1988, in Fresno, California, Wolf Rosenberg, a CSAA insured, hit a car driven by Lori Carr, in which her stepson, Michael Carr, a five-year-old boy, was riding. Rosenberg was clearly at fault.

The Carrs retained a Fresno lawyer, Timothy Magill, to represent them. In March 1989, Magill made a $25,000 settlement demand on Michael's behalf. Magill included with the demand a summary of the medical records. These records indicated that Michael's head had hit the dashboard, causing blurred vision and dizziness, a fractured nose and wrist and a cut lip that required 25 stitches. This demand was refused. On August 10, 1989, the Carrs sued Rosenberg. CSAA retained John Krebs, an attorney at Parichan, to represent him.

At first, the case did not seem unusual. Lori Carr's claim settled in late 1990 after her deposition was taken and her medical records were reviewed.

Initially, and based on Lori Carr's deposition, Krebs reported to CSAA that Michael's injuries seemed somewhat less severe than his mother's and he seemed to have recovered from them sooner than his mother.

However, at the time Lori Carr's claim settled, Magill advised Krebs that he would not be able to settle Michael's claim "because of serious behavioral problems he is having." Krebs promptly reported this development to CSAA: "In other words, Mrs. Carr and Mr. Magill want to make sure that these problems were not due to the boy's involvement in the subject accident."

A different picture of Michael began to emerge a year later (Michael was now eight years old), when Krebs received from Magill a copy of a report from a psychiatrist, Kathy Sullivan. Sullivan was asked by Magill to summarize in this report her clinical assessment of Michael and to address "the relationship of his current problems to the car accident that he was involved in at age five."

In this report, dated September 23, 1991, she provided Magill with her "working hypothesis" about Michael: "Michael was born into the world with neurologic vulnerability either due to prenatal factors or post-natal trauma of which there was some. I believe that as a young child he was suffering from a major depression that has continued throughout his childhood. I also believe that at age five he sustained a head injury that in all likelihood contributed to a marked increase in his pathology and the level of disturbance. I believe that prior symptoms were exacerbated, and Michael has suffered from a [*sic*] organic personality syndrome subsequent to that injury." She also noted that until Michael was 12 or 13 years old it would be difficult to confirm this hypothesis because it would not be until this time that his frontal lobes would be developed sufficiently to detect neurologic pathology.

Krebs promptly forwarded Sullivan's report to CSAA. A month later, in October 1991, an attorney named Mary Peterson provided CSAA with a summary of the report. This letter concluded, "Obviously Dr. Sullivan's summary of the plaintiff's condition is not helpful to us. We reiterate, however, that Dr. Sullivan's diagnosis appears predicated solely on the plaintiff's responsiveness to medications for organic personality syndrome [which would be attributable to the car accident] rather than objective findings of same and that such diagnosis was not made by any other treating psycho-therapist during the two years before Michael came under Dr. Sullivan's care."

The parties then agreed to continue a scheduled settlement conference and trial date because "plaintiff has not stabilized sufficiently to proceed with this litigation at this time."

John Krebs retired and, in August 1992, Stephen Knudsen took over the file and sent a letter to CSAA about the case. In it, he reiterated that Dr. Sullivan "is determined to attribute Michael's problems to the accident." He also noted that he did not know what plaintiff's counsel intended to do with the case and that it "may be his position that he must wait until Michael is twelve or thirteen for resolution of this issue." He told the CSAA representative that "I leave it to you whether to initiate action on this file now or let plaintiff's counsel take the next step." Three months later, Knudsen wrote CSAA seeking their authorization to refer Michael's medical records to a doctor previously retained by Krebs for a review of the causation issue. The records were forwarded to Dr. Fox in December 1992. In January 1993, Knudsen wrote to CSAA that he had forwarded the documents; he also told the CSAA representative that the "case is potentially an explosive one."

At a status conference in May 1993, Magill and Knudsen both acknowledged that the case was stalled because the cause of Michael's psychological condition had been difficult to diagnose and would be until he was several years older. The five-year time limit for bringing the case to trial would run in May of the following year. Magill suggested that he might find someone to do the testing within the next three to six months and asked for a three-month continuance. The status conference was continued to September 1993.

At this point, a series of events occurred that ultimately formed the basis of CSAA's malpractice claim. On August 30, 1993, Magill filed an at-issue memorandum. He listed as Michael's injuries "cervical strain, broken wrist, possible head trauma" and the amount of special damages as "$1,314.74+." He also noted that the case would be suitable for arbitration.

On September 14, 1993, Magill forwarded to Knudsen a copy of a review of medical records prepared by Dr. Bradley Schuyler dated August 31, 1993. This report went over much of the same ground covered by Dr. Sullivan. However, it contained the results of a test conducted on Michael on February 4, 1992. Dr. Schuyler reviewed this information and concluded "Structures which are most vulnerable in cases of head injury are the frontal and temporal lobes . . . . The SPET scan provides confirmation of dysfunction in those areas of the brain. The pattern of abnormality seen on the SPET scan are highly consistent with the areas of the brain which are most susceptible to damage in the case of frontal impact in a closed head injury."

On September 21, 1993, Knudsen wrote to CSAA. In this letter he communicated that, "[a]fter receipt of the at-issue memorandum, I talked with plaintiff's counsel and confirmed that he had abandoned his contention that the automobile accident in question caused or aggravated the youngster's mental problems. I suggested to plaintiff's counsel that because the injuries attributable to our accident are now rather ordinary, he should make a demand in an effort to compromise the case. He promised to do as much. [¶] This case now seems one where our worst fears were not realized, and what could have been a very difficult case has become otherwise. If for some reason we are not able to settle this controversy, I anticipate that it will be referred to non-binding judicial arbitration." However, Knudsen did not confirm his conversation with Magill in writing. Nor did he forward Dr. Schuyler's report to CSAA with the letter because, as he later told CSAA, "I treated Dr. Schuiler's [sic] report as being of academic interest only, believing that plaintiff's counsel had abandoned the claim to which the report was addressed."

On February 15, 1994, Knudsen wrote CSAA that he had received a Code of Civil Procedure section 998 offer (the section 998 offer) to compromise Carr's claim in the amount of $50,000, which was the per claim policy limit. He told CSAA that the offer would expire on March 14, 1994. He recommended that "we do not accept the statutory offer. Now that plaintiffs' counsel has conceded that the minor's severe psychological problems were not caused by the trauma of the accident, this case is a very ordinary one and in my opinion worth far less than $50,000. [¶] I assume based on our past discussions concerning this case, that you agree with my thoughts and unless I hear from you to the contrary, will allow the statutory offer to lapse." On March 1, 1994, CSAA increased Knudsen's settlement authority to $25,000. On March 3, 1994, CSAA told Knudsen that it was "ok to reject 998."

On March 14, 1994, at the scheduled arbitration hearing, Knudsen learned from Magill's arbitration brief that Magill did in fact intend to argue that Michael's psychological injuries had been caused by the car accident. Knudsen wrote to CSAA several days later, enclosing the Schuyler report and informing the company that Magill intended to seek recovery for Michael's psychological problems. He pointed out that CSAA had previously rejected the policy limits offer based on Knudsen's mistaken assumption that Magill did not intend to seek damages for Michael's mental injuries. This offer was made, but not accepted. Knudsen also suggested that CSAA permit him to make a motion to reinstate the policy limits offer ($50,000) under Code of Civil Procedure section 473. CSAA instructed him not to do so.

Over the next year, preparation for trial of the case began in earnest and various expert witnesses were deposed. There was a decided difference in

opinion among the experts about the cause of Michael's psychological injuries. Some suggested that the car accident contributed significantly to his problems, while others concluded that the problems preexisted the car accident and could not be attributed to it.

On May 19, 1994, Knudsen wrote to the insured, Rosenberg, and told him that a policy limits offer had been made and rejected and that he was at risk for liability in excess of the policy limits. Rosenberg retained a lawyer who, in January 1995, wrote directly to CSAA, putting it on notice that CSAA may have been in bad faith.

CSAA consulted a bad faith expert, Randolph Hicks, who advised the company that it had a "substantial risk of extra-contractual exposure."

In March 1995, several weeks before trial, CSAA substituted another law firm in place of the Parichan firm. Knudsen was asked to surrender the file to this firm and Justus Spillner, an attorney CSAA felt was more experienced than Knudsen (who had no trial experience), was chosen to try the case. After a lengthy mediation, Magill made a final demand of $850,000 to settle the case. On March 20, 1995, CSAA, settled the case for $850,000.

B.  *The Legal Malpractice Claim*

CSAA sued Parichan for legal malpractice, seeking recovery of the $850,000 settlement. CSAA contended that Parichan was negligent in not forwarding the Schuyler report before the expiration of the section 998 demand and that this act of negligence caused it to reject the policy limits settlement demand and, therefore, exposed it to bad faith liability. One claimed item of damages incurred by CSAA was the $850,000 it paid to Carr to settle his claim. The trial court granted CSAA's motion for a partial directed verdict that Parichan was negligent in failing to promptly forward the Schuyler report to CSAA.

The special verdict form given to the jury contained four questions: (1) whether Parichan was negligent in failing to promptly advise CSAA of the Schuyler report and whether such negligence caused CSAA's damages; (2) whether Parichan was negligent in any other respect; (3) whether Parichan's negligence in any other respect caused CSAA's damages; and (4) what the jury found to be the total amount of damages caused by Parichan's negligence.

The jury answered "yes" to the first question, and concluded that damages, including attorney's fees, totaled $920,849.05.

After a denial of Parichan's motion for a new trial, this timely appeal followed.

## III. DISCUSSION

### A. *The Trial Court Properly Rejected Parichan's Case-within-a-case Jury Instruction*

The elements of a tort claim for professional negligence are as follows: " ' "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." ' " (*Thomas v. Lusk* (1994) 27 Cal.App.4th 1709, 1716 [34 Cal.Rptr.2d 265].) As one commentator has framed it: "The basic proposition is that an attorney is liable for all damages proximately caused by the wrongful act or omission." (2 Mallen & Smith, Legal Malpractice (4th ed. 1996) Damages, § 19.4, p. 602.)

One significant issue in this case is whether the jury should have been required to use what is referred to as the case-within-a-case methodology to establish causation and damages. Here, Parichan unsuccessfully proposed that such a methodology be used when it asked the trial court to direct the jury to first determine the outcome of the Carr personal injury claim (i.e., whether it should have resulted in a verdict in excess of the policy limits) and the outcome of a bad faith claim against CSAA before deciding whether CSAA had been damaged.[1]

The trial court rejected Parichan's instructions. The court explained, "while the case-within-the-case method is the method of proof that is frequently, if not generally, required in legal malpractice cases, the reason

---

[1]Parichan's proposed jury instructions were as follows:

"1.   That but for [Parichan's] negligence, the *Carr v. Rosenberg* case would have resulted in a collectible judgment against CSAA's insured, Wolf Rosenberg, for more than $50,000;

"2.   That, but for such negligence, CSAA's insured, Wolf Rosenberg, would have pursued a bad faith claim against CSAA for failure to reasonably settle within the policy limits, or he would have assigned such a claim to Michael Carr, Jr.;

"3.   That, but for such negligence, the resulting bad faith lawsuit would have resulted in a judgment against CSAA on the exclusive basis that CSAA was in bad faith for refusing Michael Carr, Jr.'s policy limits demand in light of the information contained in the Bradley Schuyler, Ph.D. report of August 31, 1993; and

"4.   The amount of the judgment in the resulting bad faith lawsuit."

This instruction was based generally on BAJI No. 6.37.5 which, as of 1995, provided: "In order to recover damages from an attorney for negligence in the handling of a lawsuit, the plaintiff must not only establish that the attorney was negligent but also must establish that but for such negligence the prior lawsuit [would have resulted in a collectible judgment in plaintiff's favor] [would have been successfully defended]."

that it is [is] because those are cases in which the claim is that the lawyer mishandled the underlying case, for example, let the statute of limitations run or didn't handle the case appropriately at trial. [¶] The issue in this case, as the court sees it, is not how the underlying case would have come out but rather was CSAA reasonable in entering into the settlement in the facts and the circumstances on this particular case."[2]

We agree with the trial court. Our review of the abundant precedent in the legal malpractice arena indicates that the case-within-a-case methodology is not universally used to determination causation and damages. Although no bright line rule tells us when this methodology must be used, it is quite clear that, when the malpractice involves negligence in the prosecution or defense of a legal claim, the case-within-a-case method is appropriately employed. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 832-834 [60 Cal.Rptr.2d 780] *(Mattco Forge)* [discussing method of proof when an attorney's negligence results in loss of client's legal claim or defense].) Thus, when a client seeks to recover damages for his attorney's negligence in the prosecution or defense of the client's claim, the client must prove that "but for that negligence a better result could have been obtained in the underlying action. [Citation.] 'An attorney malpractice action then, involves a suit within a suit, a reconsideration of the previous legal claim, and only by determining whether or not the original claim was good can proximate damages be determined.' [Citation.] This trial within a trial avoids the specter that the damages claimed by a plaintiff are a matter of pure speculation and conjecture." (*Travelers Ins. Co. v. Lesher* (1986) 187 Cal.App.3d 169, 197 [231 Cal.Rptr. 791], disapproved on other grounds in

---

[2]Instead of the instructions proposed by Parichan, the jury was instructed on the elements of a legal malpractice claim. The court told the jury that defendant was negligent as a matter of law for failing to send the Schuyler report to CSAA. "The only issues remaining for you to decide on the matter of the failure to send the Schuyler report . . . are whether that failure, which was negligence, caused plaintiff to suffer damage, loss or harm and, if so, the amount of such damage loss or harm."

On the subject of damages, the jury was instructed: "As one element of damages, plaintiff seeks to recover the amount which it paid to settle the claims of Michael Carr, less the sum of $50,000, the amount of the offer made on Michael Carr's behalf to settle his claims. In order to recover all or any part of the amount paid in settlement, plaintiff has the burden of proving, by a preponderance of the evidence, that a reasonably prudent insurance company in plaintiff's position, under circumstances similar to those shown by the evidence, would have paid such amount in settlement. A reasonably prudent insurance company is one which uses ordinary or reasonable care to avoid injury to itself or others under circumstances similar to those shown by the evidence." The court then instructed the jury: "Plaintiff, California State Automobile Association Inter-Insurance Bureau, contends that it was obligated to pay in excess of the policy limit to settle the case of *Carr v. Rosenberg* because it had breached the implied covenant of good faith and fair dealing or was in bad faith. I shall now instruct you on the law regarding breach of the implied covenant of good faith and fair dealing." The court then went on to give extensive instructions regarding bad faith.

*Buss v. Superior Court* (1997) 16 Cal.4th 35 [65 Cal.Rptr.2d 366, 939 P.2d 766].)

However, in other contexts, most often involving business transactions, causation and damages may be more simply established under rules applicable to all negligence claims and the case-within-a-case procedure is not utilized. As a general rule, "[a]n attorney's liability in a malpractice action, as in other negligence cases, is for all damages directly and proximately caused by his negligence. [Citation.]" (*Enriquez v. Smyth* (1985) 173 Cal.App.3d 691, 698 [219 Cal.Rptr. 267].) One commentator describes the difference between the proof of causation and damages in the "litigation" and "transactional" malpractice contexts in this way: "When legal malpractice takes place in a transactional setting—that is, in the advising and planning of business dealings—the courts take a much less structured approach to proof of damages. No longer wedded to a narrow interpretation of what can constitute adequate proof of the fact and amount of injury, the courts tend to treat such actions like ordinary business cases and allow considerably more flexibility to plaintiffs in proving their damages." (Bauman, *Damages for Legal Malpractice: An Appraisal of the Crumbling Dike and the Threatening Flood* (1988) 61 Temp. L.Rev. 1127, 1150.)

Here, the trial court apparently concluded that it would be more appropriate to take the less structured approach to proof of causation and damages utilized in cases involving errors made by lawyers giving business advice to clients, rather than the more complex approach to causation and damages which, in the litigation setting, safeguards against speculative damage awards. In considering whether this approach is correct, we look at the nature of the services Parichan provided CSAA in order to determine whether the case-within-a-case procedure was required to establish causation and damages.

What makes this situation unusual is that Parichan was performing litigation services for Rosenberg while at the same time providing CSAA something far closer to business advice. Had Parichan committed negligence while defending Rosenberg in the *Carr* claim—for example, by missing a filing deadline—the case-within-a-case procedure would appropriately have been employed to determine whether Parichan's negligence caused Rosenberg damage. Under this procedure, if Rosenberg had no meritorious defense to the Carr claim, Rosenberg could not establish that Parichan's negligence caused him harm. Therefore, regardless of whether Parichan was negligent, no damages would have been awarded.

Here, however, there is no question about whether Parichan failed to properly defend the Carr litigation on Rosenberg's behalf. Rather, the claim

at issue is one brought by CSAA seeking damages for Parichan's negligence in carrying out certain duties Parichan owed directly to it.

In *Unigard Ins. Group v. O'Flaherty & Belgum* (1995) 38 Cal.App.4th 1229, 1235 [45 Cal.Rptr.2d 565], the court described the way in which insurance defense attorneys such as Parichan may represent the interests of both the insured and the insurer: "[w]hen, pursuant to insurance policy obligations, an insurer hires and compensates counsel to defend an insured, *provided that the interests of the insurer and insured are not in conflict*, the retained attorney owes a duty of care to the insurer . . . ." Specifically, one of CSAA's interests was to properly carry out its obligation to evaluate, in good faith, a policy limits settlement offer of an excess claim. In evaluating such an offer, CSAA was required to make an "honest, intelligent, and knowledgeable evaluation of the offer on its merits . . . ." (*Merritt v. Reserve Ins. Co.* (1973) 34 Cal.App.3d 858, 873 [110 Cal.Rptr. 511] (*Merritt*).) CSAA's failure to do so could expose it to a bad faith claim.[3] In hiring Parichan, therefore, CSAA reasonably expected the law firm to assist it in meeting this obligation. As one court tells us, "this legal duty [to evaluate settlement offers] is exercised normally in conjunction with the judgment of counsel defending the cases against the insured." (*Garner v. American Mut. Liability Ins. Co.* (1973) 31 Cal.App.3d 843, 848 [107 Cal.Rptr. 604].) CSAA alleged that Parichan negligently failed to carry out *this* duty when, after receipt of the section 998 offer, Parichan did not forward the Schuyler report to CSAA.

Parichan's negligence caused CSAA exposure to a potential bad faith lawsuit, exposure that would not have existed had Parichan forwarded the Schuyler report to CSAA. The negligence in this case is similar to that which occurred in a transactional malpractice case, *Sindell v. Gibson, Dunn & Crutcher* (1997) 54 Cal.App.4th 1457 [63 Cal.Rptr.2d 594] (*Sindell*). In *Sindell*, the attorney negligently failed to secure a consent to a transfer of property. This failure exposed the attorney's client to litigation over the

---

[3]The *Merritt* court described the factors that may be considered in determining whether the insurer's decision to reject a settlement is in bad faith: " 'In deciding whether the insurer's refusal to settle constitutes a breach of its duty to exercise good faith, the following factors should be considered: the strength of the injured claimant's case on the issues of liability and damages; attempts by the insurer to induce the insured to contribute to a settlement; failure of the insurer to properly investigate the circumstances so as to ascertain the evidence against the insured; the insurer's rejection of advice of its own attorney or agent; failure of the insurer to inform the insured of a compromise offer; the amount of financial risk to which each party is exposed in the event of a refusal to settle; the fault of the insured in inducing the insurer's rejection of the compromise offer by misleading it as to the facts; and any other factors tending to establish or negate bad faith on the part of the insurer.' [Citation.]" (*Merritt, supra,* 34 Cal.App.3d at p. 876.)

propriety of the transfer. In the context of considering when the cause of action for legal malpractice accrued, the *Sindell* court observed that, regardless of the outcome of the litigation over the property transfer, the client was harmed by the "unwanted consequence" of being exposed to this litigation. (*Id.* at p. 1470.) Regardless of whether the client lost or prevailed in the underlying litigation, it suffered damages simply by being involved in litigation it had hired a lawyer to avoid. The *Sindell* court then went on to hold that a client may recover as damages in a legal malpractice action attorney fees it incurs either in instituting or defending an action which is the result of an attorney's negligence.[4] (See also *Foxborough v. Van Atta* (1994) 26 Cal.App.4th 217, 227 [31 Cal.Rptr.2d 525] [injury occurred when client "had to resort to the more onerous, expensive and unpredictable" method of obtaining legal benefit, "the very situation it hired [attorney] to avoid."].)

In our view, the trial court in this case correctly concluded that, as in *Sindell*, the injury to CSAA was its exposure to the potential bad faith lawsuit. The trial court, therefore, asked the jury to focus on whether the $850,000 paid by CSAA as an effort by CSAA to mitigate its damages caused by Parichan's negligence was reasonable. In a similar context, as one commentator has explained, "Often a client incurs litigation expenses in an attempt to avoid, minimize or reduce the damage caused by the attorney's wrongful conduct. Mitigation expenses may be charged to the attorney even if the efforts were not productive. The key word is 'reasonable.' If the effort was made in good faith, with reasonable care, and the expenses bear a reasonable relation to the damages to be avoided or mitigated, the client may recover the expenses incurred." (2 Mallen & Smith, Legal Malpractice, *supra*, § 19.10, pp. 610-611, fns. omitted; see also *Enriquez v. Smyth, supra*, 173 Cal.App.3d at p. 698 [attorney negligently advised client to file for bankruptcy; one element of recoverable damages was cost client incurred in selling his home in reliance on advice].)

---

[4]*Sindell* also discusses two cases mentioned by counsel for Parichan at oral argument in this matter. In these cases, *Adams v. Paul* (1995) 11 Cal.4th 583 [46 Cal.Rptr.2d 594, 904 P.2d 1205] (*Adams*) and *ITT Small Business Finance Corp. v. Niles* (1994) 9 Cal.4th 245 [36 Cal.Rptr.2d 552, 885 P.2d 965] (*Niles*), overruled in *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 763 [76 Cal.Rptr.2d 749, 958 P.2d 1062], our Supreme Court considered the issue of when a cause of action for legal malpractice accrues. Although *Adams* and *Niles* do not directly consider the question before us, they do discuss the nature of various legal malpractice injuries and consider when an attorney's negligence causes a client damage. The *Adams* court, correcting what it perceived to be a somewhat narrow reading on this point in *Niles*, makes it quite clear that, rather than "articulat[ing] 'a rule for all seasons' " in determining when actionable harm occurs in a legal malpractice case, it is important to look at the unique factual circumstances of each case. (*Adams, supra*, 11 Cal.4th at p. 588.) Here, too, rather than accepting Parichan's argument that the case-within-a-case methodology applies to *all* legal malpractice claims, it is preferable to look at the nature of the conduct which is claimed to constitute malpractice before making this determination.

The jury in the present case was, therefore, properly instructed to determine whether the settlement was reasonable in light of the circumstances known to CSAA at the time.[5] Put the opposite way, in the unique circumstances of this case, a case-within-a-case instruction was not required. We emphasize, however, that, as the court explained in *Mattco Forge, supra,* 52 Cal.App.4th at pages 832-834, the case-within-a-case methodology continues to apply in all legal malpractice actions involving a client's assertion that his attorney has either negligently prosecuted or defended that client's claim.

B.-D.*

·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·   ·

## IV.   Disposition

The judgment is affirmed.

Kline, P. J., and Lambden, J., concurred.

A petition for a rehearing was denied November 28, 2000, and the petition of appellant Parichan, Renberg, Crossman & Harvey for review by the Supreme Court was denied February 21, 2001. Baxter, J., did not participate therein.

[5]For this reason we also conclude that the trial court did not abuse its discretion under Evidence Code section 352 in limiting the medical testimony regarding the causal link between the accident and the Michael Carr's injury to deposition testimony, because it properly concluded that Parichan was not entitled to a separate trial within a trial of the Carr claim.

*See footnote, *ante,* page 702.