Filed 11/7/25  Garza v. Shore, McKinley, Conger & Jolley, LLP CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| MARIA GARZA et al., | C100171 |
| Plaintiffs and Appellants, | (Super. Ct. No. STKCVUPN201815221) |
| v. | |
| SHORE, McKINLEY, CONGER & JOLLEY, LLP, | |
| Defendant and Respondent. | |

## SUMMARY OF THE APPEAL

Defendant and respondent Shore, McKinley, Conger and Jolley, LLP, served as cocounsel for plaintiffs and appellants Maria and Felix Garza in a probate action they brought against their half sister, Brenda Haugg.  In the probate action, plaintiffs alleged Brenda[1] breached her fiduciary duties as trustee of a trust to which the plaintiffs and Brenda were each a one-third beneficiary.  The Garzas alleged Brenda misused trust assets by securing loans with ranches owned by the trust, and using loan proceeds for the benefit of herself, her husband Gerald Haugg, and their company Triple H Farming

---

[1] We will often use first names to refer to people in this opinion due to common last names.

1

Corporation (Triple H). The probate case settled. Plaintiffs then sued defendant for malpractice, breach of fiduciary duty, and breach of contract.

Much of plaintiffs' briefing on appeal is unclear. Their central theory appears to be that defendant failed to conduct timely discovery in the probate action, which deprived them of financial records and Brenda's deposition testimony, which would have proven Brenda misused trust assets. But for those failures, they argue, they would have received more at trial or in settlement than the amount they ultimately settled for.

Defendant brought a motion for summary judgment (the motion) in which it argued that even if it had committed malpractice, causation was lacking because plaintiffs could not show they would have obtained a better result in the probate litigation given the evidence that (1) Brenda did not abuse the trust; (2) as a result their award would not have been higher if the probate case had gone to trial; and (3) Brenda would not have agreed to a settlement that gave them more if further discovery had been accomplished.

In opposition to the motion, plaintiffs relied on an expert declaration in which the expert opined that the Garzas would have obtained a higher award in the probate case but for defendant's malpractice. The trial court excluded the expert's opinion regarding a more favorable result on the grounds that the opinion was not based on evidentiary facts that can be used to support an expert opinion. The court then granted the motion.

In this appeal, plaintiffs challenge the trial court's ruling on the motion and evidentiary rulings the trial court made as part of its ruling on the motion. They also argue the trial court improperly denied their motion for reconsideration based on deposition testimony that was not final until after they filed their opposition.

We affirm the judgment.

2

FACTS AND HISTORY OF THE PROCEEDINGS

Facts

Brenda is the daughter of deceased husband and wife Marion G. Hat and Carmen Hat. Maria and Felix were Carmen's children from a prior marriage.

When Marion died in 2003, Brenda and Carmen became cotrustees of the Marion G. Hat Irrevocable Family Trust under instrument dated October 9, 2001, and the Carmen Hat Revocable Survivor's Trust under instrument dated October 9, 2001 (collectively "the Trust"). Maria, Felix, and Brenda were each one-third (1/3) beneficiaries of the Trust.

After Marion died, the principal assets in the Trust were two ranches on which Marion grew grapes to sell to local wineries, the Boggs Ranch and the Roma Ranch (the ranches).

Before Marion passed away, Marion, Brenda, and Gerald incorporated Triple H, and Marion contracted with Triple H to manage the ranches. When Marion died, he left his interest in Triple H to the Hauggs, who became sole owners.

After Marion's death, Triple H continued to manage the ranches until they were both sold, with the second sale completed in 2015. Before the sales, the Trust owned 91.67 percent interest in the Boggs Ranch, and the Trust and Triple H each owned a 50 percent interest in the Roma Ranch.

The Boggs Ranch sold for $1.5 million. After various amounts were deducted from the sales price, including title, escrow charges, and taxes, $1,104,249.59 went into the Trust, and $117,636.16 was paid to Triple H. One deduction was $144,016.71 to the Bank of Stockton to pay off a loan.

The Roma Ranch sold for $2.6 million. Included in the amounts paid from the sale proceeds were payments to the Bank of Stockton totaling $1,146,065.86 to cover an outstanding loan balance. After other various fees, taxes, and charges attendant to the

3

sale were paid, the Trust received $599,234.95 (withholding was deducted from its 50 percent) and Triple H received $642,624.94.

Carmen died in 2014.

In the probate action, Brenda denied the allegations accusing her of breaching her fiduciary duties as trustee. In the malpractice action that is the subject of this appeal, Brenda continued to deny she breached her fiduciary duty to the Trust beneficiaries or otherwise used loan proceeds for herself, her family, or Triple H's interests.

Complaint

According to the operative complaint, in April 2015, attorney Jane Allison Austin, whose office is in San Diego County, filed the probate action on plaintiffs' behalf in San Joaquin County. Because Austin was concerned about the additional fees plaintiffs would incur for her to travel from San Diego to San Joaquin County, she advised plaintiffs to seek an attorney in San Joaquin County who could either serve as cocounsel or substitute into the case.

Plaintiffs met with and selected defendant law firm to assist in the probate action, and Aaron Sumner McKinney was designated as the lead attorney on the case. According to the complaint, during their initial meetings in 2016, plaintiffs and McKinney agreed on the importance of beginning discovery quickly in the probate case. Plaintiffs stressed the importance of obtaining bank records and deposing Brenda. They believed the records and Brenda's deposition would produce key evidence needed to show Brenda had misappropriated Trust property for her own personal benefit.

According to the complaint in this action, at a December 12, 2017, mediation in the probate matter, the Garzas learned that defendant had not acted quickly to conduct discovery in the probate case, and that Brenda had "used most of the proceeds of the sale[s] of" the ranches, leaving roughly $700,000 in the Trust account left for distribution at the time of the mediation. According to the complaint, the probate action did not settle

4

at mediation, and Maria's, Brenda's, and Felix's depositions were scheduled for December 20, 21, and 22, 2017, respectively.

The complaint further alleges that shortly before Maria's deposition, Austin informed the plaintiffs that McKinney would not be present at her deposition, because he was on vacation. Austin also told plaintiffs she could not be at the deposition due to illness. Defendant then assigned attorney Rebecca Ruth Diel Cheshire to assist.

According to the complaint, when Maria arrived for her deposition, Cheshire told her McKinney was out of town and not answering his telephone. Cheshire said she was not sufficiently familiar with the facts to depose Brenda the next day, and that a firm partner, John McKinley, was trying to get the case settled. Brenda's counsel had offered plaintiffs each $250,000, and McKinley had said they needed to settle for that amount or risk getting nothing and incurring substantial attorney fees and costs. After some back and forth, plaintiffs settled for approximately $275,000 each, which they alleged was significantly less than what they were truly entitled to receive in the probate action.

Plaintiffs filed this action in December 2018.

Motion for Summary Judgment Based on Causation and Damages, Supporting Evidence, and Objections to Supporting Evidence

Defendant's motion was based on the theory that for each cause of action, plaintiffs could not prove the essential element of causation of damages. Defendant argued this was so because, based on undisputed evidence, plaintiffs could not prove they would have obtained a more favorable result than the settlement amount in the probate action in the absence of defendant's alleged acts. While defendant did not concede it had committed any errors in representing the plaintiffs, it also did not argue that plaintiffs would be unable to demonstrate that defendant committed malpractice.

In support of the motion, defendant filed declarations made by the Hauggs and a declaration of their counsel attaching various documents.

According to Brenda, after Marion died, between 2003 and 2014, multiple loans were taken out to pay for the continued operation of the ranches. Carmen signed the applications, promissory notes, and deeds of trusts for the loans secured by the ranches. Triple H also signed the applications, promissory notes, and deeds of trusts for the loans secured by the Roma Ranch.

According to Brenda, the proceeds from the loans were used for the management and operation of the ranches, which together had not produced net profits over several years. Before 2014, Carmen would not sell the ranches or commit the use of her own funds for the operation of the ranches. Triple H generally made loan payments that covered the Trust's share of the loans, as an advance for which Triple H would be reimbursed by the Trust to the extent of the Trust's interest in the ranch secured by a particular loan.

Carmen agreed to sell the Boggs Ranch in 2014 for $1.5 million. Brenda authorized the disbursement of $144,016.71 from the sale to pay off the loans secured by the Boggs Ranch. The closing statement from the Boggs Ranch sale shows that $144,016.71 was taken from the sale proceeds to pay the Bank of Stockton to pay off the loans. The closing statement also shows various fees (e.g., title charges, escrow charges, broker's commission) paid out from the sale proceeds. It shows Triple H was paid $117,636.16 for its 8.333 percent share of the net proceeds of the sale, and the Trust was given $1,104,249.59 for its 91.667 percent share in the net proceeds from the sale after various other title and escrow charges, taxes, and sales commissions were paid. According to Brenda, the Trust's $1,104,249.59 share was deposited into the bank account for the Trust.

According to Brenda, Carmen agreed to sell the Roma Ranch before she died. The Roma Ranch was listed by two brokers and after months on the market sold for $2.6 million.

6

According to Brenda, the Roma Ranch sustained losses every year between 2003 and 2014, which in total exceeded $2.5 million. During this period, Triple H covered virtually all the expenses for Roma Ranch, including principal and interest payments on the loans totaling $1,121,055, despite only owning 50 percent of the ranch. Triple H also accrued management fees during this time, which went unpaid.

The seller's final closing statement for Roma Ranch reflects that after paying off loans and paying fees related to the sale, $599,234.95 was paid to Brenda as the successor trustee (reflecting its 50 percent share in the net sale proceeds with withholding deducted) and Triple H received $642,624.94 (reflecting its 50 percent share in the net proceeds).

When the Roma Ranch sale was complete in 2015, Brenda authorized payments to third-party entities that sold grapes to Roma Ranch so it could fulfill its winery obligations and to third-party farming companies that performed contract services necessary to operate the ranches. These third parties had billed Triple H as the manager of the Trust properties. Payments from the proceeds included: $156,000 to Triple H Farming, $298,509 to third-parties, $570,000 to Triple H for loan payments advanced, and $20,753 to Triple H as reimbursement for loan interest payments. Brenda declared the payments arose from legitimate expenses incurred by Triple H to manage and operate the ranches and were chargeable against the Trust as owner of the ranches at the time the expenses were incurred.

After paying off loans, reimbursing Triple H, and paying Triple H and third parties for services, when Brenda filed a trustee's first account and report, the balance of cash proceeds in the Trust's bank account was $1,126,302.92.

Brenda declared she did not convert any proceeds from the sale of the ranches for her own benefit.

Plaintiffs filed a petition to compel the trustee to account for the Trust's assets in September 2015. Brenda filed a response and later filed a trustee's account and report.

7

Plaintiffs were not satisfied with the initial or subsequent accountings and filed  the complaint for breach of fiduciary duty against Brenda.

In the probate action, the Garzas accused Brenda of siphoning off Trust funds for her own personal benefit or for the benefit of Triple H.  They alleged the proceeds on the loans secured by the ranches were not used for Trust purposes, but were personal loans to benefit Brenda, Gerald, and Triple H.

Prior to settlement of the probate litigation, through her attorneys, Brenda produced copies of all financial records pertaining to the Trust and the ranches, either because they were in her possession or through subpoenas issued to lending institutions.

The probate action was settled six weeks before trial, and there were no court orders or findings that supported the allegations that Brenda breached her fiduciary duties.  At the time of settlement, approximately $750,000 was left in cash in the Trust bank account.  The remainer had been disbursed as outlined above and to pay additional professional fees and outstanding taxes.

A mediation was held in December 2017, but it took more time for the parties to reach an agreement on the formal terms of the settlement.

Under the terms of the Trust, Brenda was entitled to one-third of the rust assets after payment of her fees.

Brenda chose to settle the probate action to put the issues behind her.  It was Brenda's position that any settlement would come from the remaining funds left in the Trust, and she never would have offered money out of her own pocket.

Out of her desire to be done with the probate litigation, she agreed to a settlement that included the following terms:

Total remaining in the account prior to settlement:  $765,759.24

Reserved for expenses:  $75,000

Total remaining less expenses:  $690,759.24

8

Maria and Felix each received $281,420.43, representing 40.7 percent of Trust funds after reserve for expenses, and Brenda received $127,918.38, representing 18.5 percent of Trust funds after reserve for expenses. Had those remaining sums been divided into equal thirds, each beneficiary would have received $230,253.08. Thus, in the settlement, Brenda gave up $102,334.70 of her share of Trust funds after the reserve for remaining expenses.

Brenda declared that had the probate case proceeded to trial, she would have sought and believed she would have been entitled to compensation for her work as cotrustee and sole trustee between 2003 and 2015. She estimates she would have sought up to $166,000, which would have reduced the trust funds to $524,759.24. This would have entitled each beneficiary to $179,919.74.

Brenda also estimates that if the probate action had proceeded to trial and she prevailed, which she expected she would, an additional $100,000 would have been deducted from the Trust to pay for attorney fees, bringing the total funds available for distribution down to $424,759.34, reducing each beneficiary's third to $141,856.44. She does not believe a higher award would have been possible with further litigation.

Brenda would not have offered a higher settlement due to additional discovery or other litigation tactics in the probate action.

Gerald's declaration largely echoed Brenda's. He clarified that Triple H had made advance payments on loans with the understanding that it would be reimbursed by the Trust to the extent the Trust's interest in a ranch was used to secure a loan. He also stated that management fees owing from the Trust to Triple H had accrued over the years and remained unpaid until the ranches were sold. He said he had been prepared to produce Triple H records that had been subpoenaed by defendant in the probate action in December 2017, but the case settled before he produced them.

Defendant's counsel submitted pages from the depositions of Maria and Felix that reflected Maria lacked personal knowledge regarding how loan proceeds from loans

9

secured by the ranches were used, and Felix did not have personal knowledge about Gerald's communications with Carmen regarding the ranches' finances.

Plaintiffs made a variety of objections to the Hauggs' declarations. Some of those objections were made on "Statute of Frauds" grounds. Some were based on a lack of personal knowledge or relevance. The trial court overruled plaintiffs' objections.

Opposition Evidence and Objections to Opposition Evidence

In opposition to the motion, plaintiffs filed their own declarations; a declaration by a purported expert, attorney Jack Humes; and a declaration of their counsel attaching various documents and deposition transcripts that Humes cited as the basis for the opinions he offered.

Defendant raised various objections to the plaintiffs' declarations, and the trial court sustained many of those objections. Plaintiffs have not challenged the trial court's evidentiary rulings on the plaintiffs' declarations in this appeal.

In the admitted portions of her declarations, Maria stated that her mother did not speak English well, and stated it was unlikely Carmen had been actively involved in the management of the ranches. In his declarations, Felix stated he looked over documents from the case file defendant gave them when plaintiffs sought discovery of the entire probate case file. He said he does not believe that he saw loan documents signed by Carmen or documents that reflected payments of loan proceeds to the Trust.

Both the Garzas stated that on December 20, 2017, Maria was at the office with Cheshire while Felix was on speaker phone. Maria's deposition was scheduled for later that day. Cheshire advised plaintiffs to settle the probate case. At no time did anyone (1) suggest to the plaintiffs that defendant had a conflict of interest in continuing to represent plaintiffs in the probate litigation due to mistakes defendant made in the case; or (2) advise plaintiffs to consult independent counsel regarding their options and possible settlement.

10

In his declaration, Humes opined that defendant had committed malpractice and, as a result, plaintiffs settled the probate action for less than they otherwise would have obtained if counsel had not committed malpractice. The incidents of purported malpractice included: (1) lead counsel going on vacation, leaving an attorney unfamiliar with the case to handle depositions; (2) failing to take Brenda's deposition before the discovery cut off; (3) failing to obtain in discovery the financial records that would have been needed to take a meaningful deposition of Brenda and/or to supply an expert they had retained to conduct a forensic accounting; (4) failing to identify other forensic experts who could support claims of waste and mismanagement of Trust assets; (5) failing to try to extend the trial date and corresponding discovery cut off, which they were mere days from reaching, in order to allow more time to complete the needed discovery; and (6) failing to tell the plaintiffs about defendant's dilatory actions and not advising plaintiffs to consult with independent counsel before settling the case.

With respect to the causation of damages issue, Humes opined that but for the negligence and breach of duty by defendant, plaintiffs, "to a probable degree of legal certainty would've had the benefit of new counsel and, under the circumstances, been given extensions by the Court of the trial date, the expert disclosure exchange date and the discovery cut-off date with, to a probable degree of legal certainty, a resultant outcome substantially more favorable than they received under the settlement terms [defendant] advised them to take. . . .

"For instance, had the underlying case been tried to [a] jury I'm of the opinion the GARZA's [sic] at a minimum each should've recovered based upon the sale price of the ROMA Ranch property alone, $300,000.00 more each given that the entire amount of loan proceeds that constituted a lien on the property in the amount of $1,200,000 was taken off the top of the gross proceeds which gross proceeds were owned 50 percent each between the Trust and the TRIPLE H Farming Corporation ([]TRIPLE H.), while the entirety of the original loan proceeds were originally paid to TRIPLE H. Therefore

11

TRIPLE H. alone should have paid off the entirety of that loan balance only out of its share of the proceeds. Had the taking of those proceeds of the loan to TRIPLE H. and the charging of the trusts [*sic*] half of the gross sales proceeds with the payoff been put before a jury, I'm of the opinion the GARZAs to a probable degree of legal certainty should've received at a minimum $300,000.00 each less one third if Respondent Trustee HAUGG would've been awarded her one-third beneficiary interest in trust property without any other charges made against her share, and no other self-dealing arising out of her and her husband's Gerald Haugg's ownership interest were found to have occurred over the years during which they paid out of trust income managerial and other fees to their companies. Furthermore, if the matter goes to trial, the Defendant SHORE should be held liable under the 'case within the case' analysis for the amounts the Trustee would've been charged for in waste and conversion of trust funds and property, including thru self-dealing which trust assets Trustee HAUGG never accounted for over the time span 2003-2014. She had provided no yearly accounting that entire period and afterwards the accounting she purported to make was not accepted by the Court as to all the Breach of Fiduciary type claims made by the GARZAs against HAUGG mentioned above. . . . In any case, the result out of the settlement they accepted in reliance upon the advice of SHORE firm attorneys was infected by constructive fraud and the amount of recovery was only approximately $281,000. . . . Under this analysis, the GARZA's [*sic*] outcome should minimally be twice as much as they received in the settlement they accepted on the advice of the SHORE firm attorneys in violation of their duty of loyalty to the GARZAs. . . . Exhibits 8 and 9 are copies of the escrow closing statement accounting for the gross proceeds of sale for the BOGGS and ROMA RANCHES, the major assets of the Hat Trust subject of the litigation in the Underlying Litigation."

To support his opinion regarding plaintiffs' damages, Humes cited testimony from the first of two days (volume 1) of Austin's deposition in this action, during which she reviewed the petition to compel accounting, the response to that petition, and the

12

plaintiffs' objection to that accounting and complaint for breach of trust filed in the probate case. When asked about probate complaint allegations that the Hauggs used loan proceeds secured by the ranches for their personal use, Austin responded that the allegations were based on what the plaintiffs had said to her. Humes also cited the closing statements from the sale of the ranches and Cheshire's deposition testimony in which she stated she could not recall if she had ever seen those statements.

Defendant objected to the admission of Humes's opinion that the plaintiffs would have received a more favorable outcome in the probate litigation but for defendant's alleged malpractice. The trial court sustained the objections on the grounds that there were no evidentiary facts to support Humes's opinion.

Defendant also objected to inclusion of excerpts from the second day (or volume 2) of Austin's deposition, on the grounds that the deposition was not yet admissible under Code of Civil Procedure section 2025.520, because the deposition had occurred less than 30 days before the filing of plaintiff's evidence in opposition to defendant's motion. The pages at issue addressed an email chain in which defendant discussed Cheshire's preparedness to defend and take the December 2017 depositions. The trial court sustained the objections and stated that the excerpts were not relevant to the issues raised in the motion.

Ruling, Motion for Reconsideration, and Entry of Judgment

The trial court granted the motion.

The Garzas then filed a motion for reconsideration of the trial court's order. The plaintiffs stated that on the day the court issued its ruling on the summary judgment motion—in which it sustained objections to the evidentiary use of materials cited from volume 2 of Austin's deposition because she had not signed the transcript—Austin signed the volume 2 transcript. The Garzas argued Humes had relied on Austin's testimony in forming his opinions regarding defendant's alleged malpractice, breach of their fiduciary

13

duties, and in concluding that plaintiffs would have obtained a judgment on substantially more favorable terms in the probate litigation but for the alleged breaches.

The trial court denied the motion for reconsideration. In so doing, the court noted that when it sustained the objections to the volume 2 materials from Austin's deposition, it had also found the testimony was not relevant to the issues raised in the motion for summary judgment. The court noted it had found (1) that Austin's testimony did not support Humes's opinion about the legal certainty that the plaintiffs would have received a more favorable result in the probate litigation, and that (2) objections to the use of Humes's opinion regarding possible results of the probate litigation had been sustained, in part, on that basis.

The trial court issued a judgment of dismissal based on the granting of the motion for summary judgment. Plaintiffs filed this appeal.

Discussion

I

*Plaintiffs Have Not Shown Error in Evidentiary Rulings*

A. <u>Standards</u> <u>of</u> <u>Review</u> <u>for</u> <u>Evidentiary</u> <u>Rulings</u>

Although review of summary judgment itself is de novo, "an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard." (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694; see *Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, 584; *Michaels v. Greenberg Traurig, LLP* (2021) 62 Cal.App.5th 512, 521.)

B. <u>Plaintiffs</u> <u>Have</u> <u>not</u> <u>Shown</u> <u>Trial</u> <u>Court</u> <u>Error</u> <u>in</u> <u>Overruling</u> <u>Their</u> <u>Objections</u> <u>to</u> <u>the</u> <u>Hauggs'</u> <u>Declarations</u>

Plaintiffs argue that the trial court erred in overruling statute of fraud objections they made to the Hauggs' declarations. The substance of their argument appears to be

14

twofold.  First, they complain that the trial court's ruling on the motion referred to the personal knowledge of the Hauggs regarding, and the relevance of, "purported oral agreements" made between Carmen Hat and Triple H regarding (a) paying for loans taken out to operate the ranches, and (b) continuing to employ the services of Triple H to manage the ranches.  Second, they argue the declarations do not contain details regarding the terms of those agreements or attach copies of the described agreements.

Preliminarily, the trial court's rulings regarding the Hauggs' declarations address a range of objections made by plaintiffs to the declarations.  Those objections included some based on relevance and a purported lack of personal knowledge.  Thus, the trial court's references to the relevance of the Hauggs' statements and their personal knowledge were entirely appropriate.

With respect to the statute of frauds "argument" in their opening brief, plaintiffs cite *no legal authority* to support the proposition that the agreements at issue would fall within the statute of frauds or, even if they would, that a statute of frauds objection can serve to exclude evidence of a contract's existence in this context, where the party referencing the contracts is not attempting to enforce them.  (See Civ. Code, § 1624 [describing which agreements fall within the statute of fraud and various exceptions to agreements that fall within it].)

The entire argument cites a single authority, *American Casualty Co. v. Curran Productions, Inc.* (1963) 212 Cal.App.2d 386.  That case is cited to support the proposition that when trial judges review affidavits submitted on motions for summary judgment, they should "strictly construe[]" the affidavits of the moving party and "liberally construe[]" the affidavits of the nonmoving party.  (*Id.* at p. 391.)  This well-settled principle addresses how evidence is treated once it is admitted, not how much leeway the court should give in determining if evidence is admissible.

In its respondent's brief, the defendant makes various arguments, citing case law and, with a reasoned analysis, as to why the statute of frauds would not apply to the

15

agreements discussed in the Hauggs' declarations. In their reply brief, plaintiffs make no meaningful effort to respond to these arguments and instead imply—again without a sufficiently developed argument—the real issue is a hearsay problem. In so doing, they cite, but do not analyze the applicability of Civil Code section 1624, subdivision (a)(1). They also cite Evidence Code section 801, which addresses the permissible form and scope of an opinion offered by a witness testifying as an expert. That is, they raise a new argument, include inapplicable authority, *and* fail to provide any reasoned authority to support that argument. (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2022) 77 Cal.App.5th 971, 982 [points raised for the first time in a reply brief are forfeited].)

In short, plaintiffs have not met their burden to show the trial court abused its discretion when it overruled plaintiffs' statute of frauds objections to the Hauggs' declarations. We will consider those declarations when we evaluate whether the trial court properly granted the motion.

C. Plaintiffs Have Shown no Error Regarding the Trial Court's Sustaining Defendant's Objections to the Humes Declaration

Under California Evidence Code section 801, an expert witness's opinion is limited to opinion that is, "(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

" 'The value of opinion evidence rests not in the conclusion reached but, in the factors considered and the reasoning employed. [Citations.] Where an expert bases his

16

conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value.' (*Pacific Gas & Electric Co. v. Zuckerman*[ (1987)] 189 Cal.App.3d [1113,] 1135.)" (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 563.)

"An expert opinion has no value if its basis is unsound. (*People v. Lawley* (2002) 27 Cal.4th 102, 132; *People v. Bassett* (1969) 69 Cal.2d 122, 141, 144.) . . . Evidence Code section 801, subdivision (b), states that a court must determine whether the matter that the expert relies on is of a type that an expert reasonably can rely on 'in forming an opinion *upon the subject to which his testimony relates.*' (Italics added.) We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible." (*Lockheed Litigation Cases*, *supra*, 115 Cal.App.4th at p. 564; accord, *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770.)

"A trial court exercises discretion when ruling on the admissibility of expert testimony under Evidence Code section 801, subdivision (b). If the court excludes expert testimony on the ground that there is no reasonable basis for the opinion, we review the exclusion of evidence under the abuse of discretion standard." (*Lockheed Litigation Cases*, *supra*, 115 Cal.App.4th at p. 564.)

We conclude that the exclusion of Humes's opinion regarding "the value of the [probate] case and/or . . . [on] the legal certainty of a more favorable settlement or judgment" was not an abuse of discretion.

The "evidence" Humes's opinion relies upon is not the sort of evidence reasonably relied upon to form an expert opinion on damages. To wit, the excerpts from the deposition of Austin relied upon are about her inclusion of certain allegations in probate court filings that were based on representations made by the Garzas. Austin had no personal knowledge that Trust funds were misused, and the pleadings below simply

17

reflect arguments and theories she would pursue. The undisputed fact Humes relies on simply addresses how much the Garza's received, and it does not offer evidence regarding what they could have received. As the trial court correctly stated, the closing statements "set forth the purchase price paid and the commissions, charges, payoffs and withholdings deducted from the purchase price, accounting for the final payout amount made to the Trust for each sale. The charges include the payoff to Triple H as a partial owner of the property. The payouts are commensurate with Triple H's ownership interests in the ranches as the case may be. In addition, there are payments made to Triple H both as reimbursement and as invoiced for Triple H's management and/or operation services for the Trust. Neither Ms. Cheshire's testimony nor the exhibits referenced suggest any impropriety in the payout or distribution of the sale proceeds. Ms. Cheshire offers no testimony from her personal knowledge of an impropriety in the use of the Trust assets." There is no evidence presented to support the expert's opinion plaintiffs would have received more than they did either through settlement negotiations or at trial. The expert witness declaration is speculative in the extreme.

We will not consider Humes's opinion regarding the possible damages plaintiffs suffered in reviewing the trial court's ruling on the motion. The trial court did not improperly exclude it. (See *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 ["On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained"].)

## II

*Summary Judgment Was Properly Granted*

A.  Standards of Review for Motions for Summary Judgments and Evidentiary
    Rulings

"The standard of review for summary judgment is well established.  The motion 'shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).)  A moving defendant has met his [or her] burden of showing that a cause of action has no merit by establishing that one or more elements of a cause of action cannot be established or that there is a complete defense."  (*Lackner v. North* (2006) 135 Cal.App.4th 1188, 1196 (*Lackner*); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849; Code Civ. Proc., § 437c, subds. (*o*)-(p).)

To show that an element cannot be established, a "defendant may rely upon factually insufficient discovery responses by the plaintiff to show that the plaintiff cannot establish an essential element of the cause of action sued upon.  [Citation.]  Alternatively, the defendant may utilize the tried and true technique of negating ('disproving') an essential element of the plaintiff's cause of action."  (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1598.)  Once a defendant has shown that one or more of the elements of a cause of action cannot be established, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action. . . .  The plaintiff or cross-complainant shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to the cause of action . . . ."  (Code Civ. Proc., § 437c, subd. (p)(2).)  " 'A cause of action "cannot be established" if the undisputed facts presented by the defendant prove the contrary of the

19

plaintiff's allegations as a matter of law.' (*Brantley v. Pisaro*[, *supra*] 42 Cal.App.4th [at p.] 1597.)" (*Marshak v. Ballesteros* (1999) 72 Cal.App.4th 1514, 1518.)

"We independently review an order granting summary judgment, viewing the evidence in the light most favorable to the nonmoving party." (*Lackner*, *supra*, 135 Cal.App.4th at p. 1196; see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) "In performing our independent review of the evidence, 'we apply the same three-step analysis as the trial court. First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue.' (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438.)" (*Lackner*, at p. 1196.)

"In determining whether there is a triable issue of material fact, we consider all the evidence set forth by the parties except that to which objections have been made and properly sustained. (Code Civ. Proc., § 437c, subd. (c); *Guz v. Bechtel National, Inc.*[, *supra*] 24 Cal.4th [at p.] 334.) We accept as true the facts supported by plaintiff's evidence and the reasonable inferences therefrom [citation], resolving evidentiary doubts or ambiguities in plaintiff's favor." (*Lackner*, *supra*, 135 Cal.App.4th at p. 1196.)

B.  Damages are an Essential Element of Plaintiffs' Claims

" 'The elements of a cause of action for legal malpractice are (1) the attorney-client relationship or other basis for duty; (2) a negligent act or omission; (3) *causation*; and (4) *damages*.' (*Kurinij v. Hanna & Morton* (1997) 55 Cal.App.4th 853, 863 (*Kurinij*), italics added.) Summary judgment is appropriate if the defendant negates any of these elements. (*Ibid.*)" (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1528; see *Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1508-1509.)

"A plaintiff alleging legal malpractice in the prosecution or defense of a legal claim must prove that, but for the negligence of the attorney, a better result could have

been obtained in the underlying action. (*California State Auto. Assn. Inter-Ins. Bureau v. Parichan, Renberg, Crossman & Harvey* (2000) 84 Cal.App.4th 702, 710.) The purpose of this methodology is to avoid damages based on pure speculation and conjecture. (*Ibid.*)" *(Orrick Herrington & Sutcliffe v. Superior Court* (2003) 107 Cal.App.4th 1052, 1057; see also *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1235, 1241.)

"Thus, a plaintiff who alleges an inadequate settlement in the underlying action must prove that, if not for the malpractice, she would certainly have received more money in settlement or at trial. [Citation.] Such claims are likely to be speculative, as even the most skillful attorneys can seldom know whether they obtained the best possible result; thus, they are held only to the standard of whether the settlement was within the realm of reasonableness." (*Slovensky v. Friedman*, *supra*, 142 Cal.App.4th at 1528.)

To meet this burden, "[i]t is not enough for [a plaintiff] to simply claim . . . that it was possible to obtain a better settlement or a better result at trial. The mere probability that a certain event would have happened will not furnish the foundation for malpractice damages. ' "Damages to be subject to a proper award must be such as follows the act complained of as a *legal certainty*." ' " (*Barnard v. Langer* (2003) 109 Cal.App.4th 1453, 1461-1462.)

Similarly, an essential element of both a breach of contract and a breach of fiduciary duty cause of action is that the defendant's misconduct or breach was the cause in fact of plaintiff's damages. (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102; see also *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 464 [contract cause of action]; *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182 ["To establish a cause of action for breach of fiduciary duty, a plaintiff must demonstrate the existence of a fiduciary relationship, breach of that duty and damages"]; *St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1060 ["An essential element of a claim for breach of contract are damages *resulting from the breach*"].)

21

C.  <u>Defendant</u> <u>has</u> <u>Shown</u> <u>Plaintiffs</u> <u>Cannot</u> <u>Prove</u> <u>Defendant</u> <u>Caused</u> <u>Them</u> <u>Damage</u>

Defendant satisfied their initial burden to show plaintiffs could not prove causation and damages.  With the Hauggs' declarations, they presented evidence that Brenda did not breach her fiduciary duties as trustee by siphoning off funds for her personal use.  With Brenda's declaration, defendant also supplied evidence that had the probate case gone to trial, the Trust's assets would have been further depleted by the costs of litigation and trust administration fees, and the plaintiffs' percentage share of funds that remained after trial would have been less than what they were awarded in the settlement.  Defendant also presented evidence that Brenda would not have agreed to settle the probate action on more favorable terms to the plaintiffs had defendant pursued more discovery.

Because defendant provided evidence that plaintiffs did not suffer damages because of defendant's actions or inactions, plaintiffs needed to produce evidence that they suffered damages because of the alleged malpractice.  (Code Civ. Proc., § 437c, subd. (p)(2).)  The only evidence plaintiffs offered that they could have obtained better results but for defendant's malpractice was (1) a properly excluded expert opinion; and (2) speculative statements contained in the Garza's supplemental declarations that were also excluded based on sustained objections.  Thus, plaintiffs failed to provide admissible evidence of any damages, and the defendant was entitled to summary judgment.

III

*The Trial Court Properly Denied the Motion for Reconsideration*

Plaintiffs argue their motion for reconsideration should have been granted and the trial court should not have found volume 2 of Austin's deposition testimony was irrelevant.  The trial court acted within its discretion.

22

Under Code of Civil Procedure section 1008, subdivision (a), "[w]hen an application for an order has been made to a judge, or to a court, and . . . granted . . . any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts . . . make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order." (Code Civ. Proc., § 1008.)

"A trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard." (*Farmers Ins. Exchange v. Superior Court* (2013) 218 Cal.App.4th 96, 106; see *Torres v. Design Group Facility Solutions, Inc.* (2020) 45 Cal.App.5th 239, 243.)

The trial court did not abuse its discretion when it denied the motion for reconsideration. To the extent they provided any evidence that might have supported plaintiffs' malpractice action, the excerpts from volume 2 of the transcript of Austin's deposition and related exhibits that prompted plaintiffs' motion for reconsideration went to the issue of whether defendant had committed malpractice in the probate action. In contrast, defendant's motion was brought on the basis that *even if* plaintiffs could prove defendant had committed malpractice or otherwise had failed in their representation of plaintiffs in the probate action, plaintiffs could not prove that defendant's actions (or lack of actions) caused damages.

Indeed, in the paragraph of his declaration in which he attempted to explain his opinion that the plaintiffs would have received "a resultant outcome substantially more favorable" in the probate action but for defendant's alleged malpractice, Humes did not cite the Austin volume 2 deposition pages that plaintiffs asserted provided new facts warranting reconsideration of the motion.

The trial court granted the motion on the grounds that plaintiffs could not "establish the necessary elements of causation and/or damages." The newly approved deposition pages would have had no impact on this conclusion.

## DISPOSITION

The judgment is affirmed.  Under California Rules of Court, rule 8.278(a)(1) and (2), defendant and respondent Shore, McKinley, Conger and Jolley, LLP is entitled to its costs on appeal.

 

_____

HULL, Acting P. J.

We concur:

_____

KRAUSE, J.

_____

WISEMAN, J.[*]

---

[*]  Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.